Robert NAHIGIAN, on behalf of himself and those similarly situated, Plaintiff,

v.

Gerald R. LEONARD, Timothy M. Byrd, and Shannon Tvrdik, Defendants.

No. CIV.A.02–11144–WGY.

United States District Court, D. Massachusetts.

Nov. 22, 2002.

Howard M. Brown, Bartlett, Hackett, Feinberg, Gentilli, Liston, Brown & Phalen, PC, Boston, MA, for Plaintiff.

John F. Tocci, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Eileen Sunshine, Sullivan & Worcester, LLP, Heidi E. Harvey, Fish & Richardson, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

The plaintiff Robert Nahigian ("Nahigian") alleges that his wages were never paid during the bi-weekly period before he was terminated by his former employer, Marketing Specialists Corp. ("Marketing Specialists"). He further alleges that during the same bi-weekly period, Marketing Specialists never forwarded the money that was supposed to be withheld from his wages and forwarded to flexible spending and health insurance accounts. In addition, he alleges that his fellow Marketing Specialists employees—virtually all of whom were terminated along with Nahigian—also failed to receive their wages and benefits.

Nahigian sued three officers of the corporation—Gerald R. Leonard ("Leonard"), Timothy M. Byrd ("Byrd"), and Shannon Tvrdik ("Tvrdik")—in the Massachusetts Superior Court sitting in and for the county of Norfolk, alleging violations of several Massachusetts statutes. In response to Nahigian's claim that his money was not forwarded to a flexible spending account and health insurer as expected, Tvrdik submitted that this cause of action was "completely preempted" by the federal Employee Retirement Income Security Act ("ERISA"), and removed the action to this court, pursuant to *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).

Tvrdik and Byrd now move to dismiss the action for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2), and for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). This Court rejects both of those arguments, but holds that it lacks subject matter jurisdiction over Nahigian's complaint, and thus remands it to the Massachusetts Superior Court sitting in and for the County of Norfolk.

## II. BACKGROUND

Nahigian is a former employee of Marketing Specialists, which had its principal place of business in Canton, Massachusetts. After Marketing Specialists filed for Chapter 11 bankruptcy on May 24, 2001, it terminated Nahigian and virtually all of his fellow employees on May 31, 2001. Marketing Specialists itself is not a party to this lawsuit (indeed, it is unclear whether it still exists). During all periods relevant to this lawsuit, Gerald R. Leonard is alleged to have been president and chief executive officer of Marketing Specialists, Byrd is alleged to have been the chief financial officer, and Tvrdik is alleged to have been the treasurer.

Nahigian's complaint arises from Marketing Specialists' inability to fund its payroll in May 2001, just before Nahigian and his colleagues had their employment officially terminated. His three claims all relate to the final two-week pay period between May 13 and May 26, 2001. First, Nahigian claims that when Marketing Specialists terminated his employment on May 31, 2001, he was owed $3,758.46 in unpaid wages, and that this amount remains unpaid. He alleges that this failure to pay wages constitutes a violation of Mass. Gen. L. ch. 149, § 148, which makes it a crime for an employer not to pay wages regularly to her employees. Civil lawsuits to remedy such violations (including treble damages and reasonable attorney's fees) are authorized by Mass. Gen. L. ch. 149, § 150. Second, Nahigian alleges that during the two-week pay period in question, Marketing Specialists withheld certain monies from his pay to fund the purchase of health insurance, but failed to forward those funds to the health insurers. Third, Nahigian alleges that an additional $423.30 was withheld from his pay for use in a flexible spending account, but never transferred to that account. Nahigian states that these second and third claims violate Mass. Gen. L. ch. 149, § 150C, which makes it a crime to take money from employees for the purposes of buying insurance and then not actually purchasing the insurance. Civil lawsuits to remedy such violations (again including treble damages and reasonable attorney's fees) are authorized by Mass. Gen. L. ch. 149, § 150.

Prior to filing suit, Nahigian filed a complaint with the Massachusetts Attorney General as required by Section 150. In his initial complaint, Nahigian named as defendants only Marketing Specialists and Leonard (Byrd and Tvrdik were not named). Nahigian subsequently received permission from the Attorney General to proceed with a civil lawsuit. After filing this civil action, Nahigian filed a second complaint on June 13, 2002 that specifically named Byrd and Tvrdik as parties. Howard M. Brown Aff., Ex. F. [Docket No. 13]. The attorney general gave Nahigian leave to proceed with a civil action based on this second complaint on June 26, 2002. Howard M. Brown Aff., Ex. G.

Alleging that Nahigian's second and third claims, although based on state law, are "completely preempted" by ERISA, Tvrdik removed the action to federal court on June 7, 2002. Under the complete preemption doctrine established in *Metropolitan Life Insurance Co.*, 481 U.S. at 66, 107 S.Ct. 1542, such removal is proper as long as ERISA preempts the stated cause of action and the action falls within the scope of ERISA's exclusive civil enforcement provision, 29 U.S.C. § 1132(a). If these standards are met, then the state law claims asserted by Nahigian are automatically "converted into federal claims." *Hall v. Blue Cross Blue Shield of Alabama*, 134 F.3d 1063, 1065 (11th Cir.1998). Thus, this Court has federal question jurisdiction over Nahigian's second and third claims. This Court has supplemental jurisdiction over Nahigian's first claim (nonpayment of wages), which arises purely under state law. As noted above, Nahigian is also suing "on behalf of others similarly situated," which is explicitly permitted by Section 150.

Byrd and Tvrdik have both filed motions to dismiss, raising two grounds. First, they move to dismiss under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. Specifically, they allege that they do not reside within the state and cannot be subjected to jurisdiction under the Massachusetts Long Arm statute because any contacts that they had with the state were not "but for" causes of the harm alleged by Nahigian. Mass. Gen. L. ch. 223A, § 3(a). Second, they have moved to dis-

miss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. They argue 1) that the definition of "employer" under Mass. Gen. L. ch. 149, § 150 does not include officers of a company, and 2) that Nahigian failed to exhaust the administrative remedies required under section 150, because Byrd and Trvdik were not personally named in the first complaint. Their motions to dismiss under Rule 12(b)(6) relate only to Nahigian's pendent state law claim (refusal to pay wages); Nahigian's other claims are no longer state law claims but have been converted into federal claims under ERISA.

With respect to personal jurisdiction, the relevant facts are as follows: Marketing Specialists Corporation was one of the largest food brokerage firms in the United States. During the relevant period, Marketing Specialists' primary executive and corporate office (40,700 sq. ft) was in Texas, although a large 45,000 sq. ft. executive office was located in Canton, Massachusetts, the former headquarters of Merkert Enterprises, a Marketing Specialists merger partner. Both Leonard and Nahigian worked out of the Canton office.

Leonard is a resident of Massachusetts. Byrd and Trvdik, however, are residents of Texas. Byrd served as Marketing Specialists Chief Financial Officer from October 1999 to August 2000, and from January 2001 to May 2001. Trvdik served as the company's Treasurer from March 2000 to October 2001; prior to holding that position, she served as Northern Division Controller from August 1999 to February 2000. Neither individual worked directly for Marketing Specialists while holding these posts; rather, both worked for a company, Richmont Marketing Specialists Corp. ("Richmont"), that was the primary investor in the company. Trvdik owns no property in Massachusetts and has only visited the state three times: twice during her term as Treasurer and once (for several weeks) while serving as Northern Division Controller. Byrd had visited Massachusetts approximately five times as a tourist before taking the Chief Financial Officer position, and about eight times since becoming involved with the Marketing Specialists.

Both Trvdik and Byrd admit to making "sporadic" phone, e-mail, and fax contacts with the Canton office. Byrd Aff., ¶ 7 [Docket No. 4]; Trvdik Aff., ¶ 12 [Docket No. 7]. Nahigian challenges the characterization of these contacts as "sporadic" as patently incredible, in light of Canton's status as a major office of the company, and Leonard's statement in an earlier (bankruptcy) deposition that Byrd and Trvdik both worked closely with Leonard, who was situated in the Canton office. Pl.'s Opp'n to Motion to Dismiss at pp. 5–6 [Docket No. 11]. Both Byrd and Nahigian state in their affidavits that none of their travels related to the company's payroll, and that in none of their phone, fax, and e-mail contacts with the Canton office did they instruct anyone to refrain from distributing Marketing Specialists' May 2001 payroll. Byrd Aff., ¶ 9, Trvdik Aff., ¶ 12. Byrd further adds that he was responsible primarily for debt-restructuring and capitalization of the company, and not day-to-day operations. Byrd Aff., ¶ 8.

The documents presented by Nahigian on the personal jurisdiction issue primarily relate to Byrd. Nahigian essentially presents no information on Trvdik. With respect to Byrd, Nahigian presents a position statement of Leonard, in which Leonard states:

During early 2000, [Marketing Specialists] Directors Nicholas Bouras, John Rochon and *Timothy Byrd* ... assumed the active management of [Marketing Specialists]. Messrs. Bouras, Rochon, and *Byrd* (the "Richmont Partners") were the principals of the Richmont

Corporation which had invested heavily in [Marketing Specialists]. [They] increasingly controlled all [Marketing Specialists] corporate, strategic, and financial decision-making. By May 2001, [they] had shut their fellow directors, including Mr. Leonard, out of the decision making process.

Brown Aff., Ex. A at 2. (emphasis added). He also presents the affidavit of James Schlindwein (former director of Marketing Specialists), who states that Byrd and the two others mentioned above "substantially controlled" the company during its final year of existence. Brown Aff., Ex. C at ¶ 3.

In addition, Nahigian points to a deposition taken from Leonard during bankruptcy proceedings. In his deposition testimony, Leonard indicated that Marketing Specialists started having severe problems making payroll and paying other expenses in March 2000, and that Richmont was forced to fund these expenses. Brown Aff., Ex. D at 57. Richmont was cutting back on the expenses paid during early 2001, with the result that Marketing Specialists was barely making payroll and was not paying some electricity, garbage, and supply expenses. In his testimony, Leonard implied that Byrd and the other two Richmont Partners were mismanaging the company. *Id.* at 80–81. In January or February 2001, Marketing Specialists hired bankruptcy counsel to consider the possibility of bankruptcy, and Chapter 11 bankruptcy was filed on May 24, 2001, just before the payroll incident that caused

this case. On May 22, Byrd told Leonard by phone that the banks would fund the payroll, but on May 23, Byrd called Leonard again and told him the payroll would not be funded by the banks after all. Both of these calls were made to Leonard while he was in Massachusetts. *Id.* at 81–82. Richmont had been negotiating with the banks during the period leading up to May 23. *Id.* at 81. Leonard also testified that Byrd had Richmont funds available to fund the payroll, but refused to do so. Brown Aff., ex. A at 5.

Nahigian's final documentary support for his argument that this Court has personal jurisdiction over Byrd comes from two letters that he received from Marketing Specialists in May and June 2001, while he was in Massachusetts. These letters informed him that his employment had been terminated and that the status of his back wages and benefits had not been determined. They were both signed by Byrd. Nahigian Aff., Ex. A & Ex. B. [Docket No. 12].

## III. DISCUSSION

### A. Personal Jurisdiction—Rule 12(b)(2)

 Byrd and Tvrdik allege that this Court lacks personal jurisdiction over them. Their argument fails because they wrongly apply the Massachusetts Long–Arm statute and the constitutional "minimum contacts" (with the forum state) tests to this case, when in fact they are inapposite.[1] As noted above, Nahigian's second

---

1. It is questionable whether this standard would shield Byrd from suit in a Massachusetts court even if it were applicable. Byrd and Tvrdik correctly state that because they were not "tagged" within Massachusetts and do not own property in the state, nor has Nahigian alleged that the Commonwealth has general jurisdiction over them, the relevant inquiry must be a specific jurisdiction test. This, they argue, places a burden on the plaintiff to show: 1) that jurisdiction is proper under the Massachusetts Long–Arm statute, and 2) that jurisdiction comports with the Due Process Clause of the United States Constitution. *Landmark Bank v. Machera,* 736 F.Supp. 375, 379–383 (D.Mass.1990).

Byrd and Tvrdik argue that the contacts alleged by Nahigian do not meet the requirements of the Massachusetts long-arm statute, which permits jurisdiction to be exercised over a defendant who "transact[s] any busi-

**158**

and third claims are now considered to be federal and not state law claims.

▬▬▬ In a federal question case, the constitution requires only that defendants have minimum contacts with the United States. *United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992). As both Byrd and Tvrdik are residents of Texas, they clearly meet this test. A plaintiff must also satisfy the statutory requirements for territorial limits of effective service found in Fed.R.Civ.P. 4(k). Ordinarily, this requirement is that the defendants "would be subjected to the jur-

isdiction of a court of general jurisdiction in the state in which the district court is located," thus imposing the same long-arm statute plus minimum contacts with the forum state analysis that applies to cases in state courts or diversity cases in federal courts. Fed.R.Civ.P. 4(k)(1)(A). Rule 4(k)(1)(D), however, states that service is also effective "when authorized by statute of the United States." Thus, a statute can establish nationwide service of process.

The ERISA statute provides that "where an action under [ERISA] is brought in a district court of the United States ... process may be served in any

ness in the commonwealth." Mass. Gen. Laws ch. 223A, § 3(a). They do not seriously dispute that their various visits, phone calls, and e-mails constitute transacting business as defined by the statute. They stress, however, that a plaintiff's cause of action must "arise from" these contacts. *Id.*

Massachusetts courts have defined the phrase "arise from" as meaning that the business transacted within the state must be a "but for" cause of the harm. *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 770–771, 625 N.E.2d 549 (1994). In other words, Nahigian must show that the harm would not have occurred in the absence of the business. This is intended to be a broad test. The Massachusetts long-arm statute is intended to extend personal jurisdiction to the constitutional limit. *Id.* at 771, 625 N.E.2d 549. Byrd and Tvrdik argue that any business they transacted within the state lacks even this broad "but for" relationship to the harm alleged—namely, the failure of the company to pay Nahigian his wages and benefits. Although Massachusetts does not abide by the fiduciary shield doctrine, which states that any contacts of a corporate officer in her official capacity do not help to establish personal jurisdiction, *Shipley Co. v. Clark*, 728 F.Supp. 818, 821 (D.Mass.1990) (Tauro, J.), it still adheres to the general rule that jurisdiction over an officer cannot be based solely on jurisdiction over the corporation, *see Beaver Builders v. Schnip Bldg.*, 622 F.Supp. 1051, 1054 n. 1 (D.Mass.1985); it must be based on acts of the officer themselves, rather than simply the corporation, within the forum state. *Id.* Byrd and Tvrdik argue that all of their own con-

tacts with Massachusetts are unrelated to the non-payment of wages and benefits in May 2001.

If this is true, it follows as a matter of course that the constitutional requirements cannot be satisfied. The constitutional test of "relatedness" (between contacts and cause of action) in the First Circuit is a stricter test: essentially a proximate cause test that is closely linked to foreseeability, (i.e. that the defendant could reasonably anticipate being haled into court in the forum state), with some flexibility. *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 714–16 (1st Cir. 1996).

However, although there is no evidence that any of Tvrdik's contacts with Massachusetts had any sort of causal relationship to the harm Nahigian alleges, there is evidence of a causal relationship between Byrd's contacts and Nahigian's harm. Indeed, there is considerable evidence that Byrd and two others were controlling the company's operations in 2000 and 2001, and allegedly mismanaging it. Many of these activities in controlling the company arose from contacts (telephone, e-mail, fax) with Massachusetts. Thus, Marketing Specialist's poor financial health can be attributed largely to Byrd. This poor financial health, in turn, led to Byrd and the two other Richmont partners' decision to go into bankruptcy of May 2001. Thus, Byrd could indeed be considered a "but for" cause of the harm under the Massachusetts long-arm statute. Whether the First Circuit's strict personal jurisdiction test would also permit this Court to exercise personal jurisdiction over Byrd is a tougher issue.

other district where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). This provision has been interpreted to provide for nationwide service of process. *United Electrical,* 960 F.2d at 1086. Thus, because Byrd and Tvrdik have minimum contacts with the United States and were served within the United States, personal jurisdiction is proper.

The preceding analysis raises two difficult issues, neither of which were mentioned by the parties. The first is whether the fact that this action was not initially filed in state court, but rather removed to federal court, makes a difference, especially given that this action was initially filed in wholly state law terms and not under ERISA. The ERISA extraterritorial statute, 29 U.S.C. § 1132(e)(2), speaks of actions "brought in a district court." There is very little law on this issue, but the fact of removal does not seem to make a difference. As a starting point, 28 U.S.C. § 1441(e), part of the federal removal statute, states that "the court to which [a] civil action is removed is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim." According to the First Circuit, the purpose of this rule is to avoid inefficient dismissals and refilings. *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 217–18 (1st Cir.1987).

This case seems to fall squarely within the language and policy of the rule. The state court lacked jurisdiction, but this court has it. Furthermore, dismissing the claim would be inefficient, because it would simply lead Nahigian to refile in federal court immediately, as the statute of limitations has not expired. While Section 1441(e) is usually applied with respect to subject matter jurisdiction, it has also been applied to personal jurisdiction matters. *See Eccles v. National Semiconductor*

*Corp.,* 10 F.Supp.2d 514, 519 n. 4 (D.Md. 1998). Finally, this Court was able to find no cases *denying* the applicability of nationwide service in a completely preempted ERISA case, and did find one case *allowing* nationwide service in these circumstances. *See Briesch v. Auto. Club of S. Cal.,* 40 F.Supp.2d 1318, 1320–21 (D.Utah 1999).

The second issue relates to whether the nationwide service of process that is available on the federal ERISA claims (the second and third claims) also applies to establish personal jurisdiction over the pendent state claim (the first claim for nonpayment of cash wages). This is simply a statutory issue (dealing with the interpretation of Fed.R.Civ.P. 4(k)), rather than a constitutional issue. The First Circuit has been silent on this issue. However, several major circuit courts and the District of Massachusetts, primarily on grounds of efficiency, have interpreted Rule 4(k) to allow nationwide service of process to be effective for state law claims alleged by the plaintiff that arise from the same nucleus of operative facts as the plaintiff's federal claims that benefit from nationwide service. This doctrine is termed "pendent personal jurisdiction." *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1056–57 (2d Cir.1993); *Robinson v. Pa. Cent. Co.,* 484 F.2d 553, 554–56 (3d Cir.1973); *Salpoglou v. Shlomo Widder, M.D., P.A.,* 899 F.Supp. 835, 838 (D.Mass.1995) (Lasker, J.); *Amtrol, Inc. v. Vent–Rite Valve Corp.,* 646 F.Supp. 1168, 1174–76 (D.Mass.1986); *cf. Olin Corp. v. Fisons PLC.,* 47 F.Supp.2d 151, 155 (D.Mass.1999) (noting that doctrine of pendent personal jurisdiction is closely tied to "the jurisprudence of pendent subject matter jurisdiction"). *But see Wilensky v. Standard Beryllium Corp.,* 228 F.Supp. 703, 705–06 (D.Mass.1964) (Caffrey, J.) (denying doctrine of pendent personal jurisdiction on grounds that it was not created explicitly by the statute). *See generally*

4B Wright & Miller, Federal Practice and Procedure Civ.3d., § 1125 (noting that most courts follow the *Herrmann* rule). Since this state claim appears to arise from the same nucleus of operative facts as the ERISA claims, this court has personal jurisdiction over Byrd and Tvrdik with respect to the state claim as well as the ERISA claims.

### B. Alleged Failure to State a Cause of Action—Rule 12(b)(6) Motion

The issues raised in the defendants' Rule 12(b)(6) motion implicate only Nahigian's pendent, state law claim (failure to pay wages). The 12(b)(6) motion does not implicate the two claims preempted by ERISA, which have now been transformed into federal claims.[2] As this is a state law issue, Massachusetts law governs.

### 1. Definition of Employer in Mass. Gen. Laws, ch. 149, § 148 and § 150

■ Byrd and Tvrdik first raise an issue of statutory interpretation. They acknowledge that although Section 148, which makes it a crime for an "employer" not to pay wages regularly, uses a special definition of "employer" that includes corporate officers. They argue, however, that this expansive definition does not carry over to Section 150, which establishes a civil remedy for employees aggrieved by a violation of Section 148. Thus, Byrd and Tvrdik argue that as corporate officers they cannot be individually sued under Section 150 for a violation of Section 148. Rather, only the company itself (Market-ing Services) can be sued. This argument fails because it is not supported by the small amount of state law that exists on this subject and is contrary to the well-settled canons of statutory interpretation that statutes should be read according to their plain meaning and should not be read to achieve an absurd result. Accordingly, the Court holds that corporate officers like Byrd and Tvrdik can indeed be sued under Section 150 for violating Section 148.

Section 148 provides that "the president and treasurer of a corporation and any officers and agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section." Mass. Gen. L., ch. 149, § 148. Section 150 contains no definition of "employer." Byrd and Tvrdik argue that Section 148's special definition of employer cannot carry over to Section 150, invoking the maxim that when particular language is included in one section of a statute but omitted in another, it is generally presumed that the legislature acted intentionally and purposely in the disparate inclusion or exclusion. *Leclair v. Town of Norwell,* 430 Mass. 328, 336, 719 N.E.2d 464 (1999). Byrd and Tvrdik also note that at common law, one reaches beyond the corporate form to get at its officers only in rare situations, *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619–620, 233 N.E.2d 748 (1968) (Cutter, J.), and that statutes in derogation of the common law are strictly construed, *Kerins v. Lima,* 425 Mass. 108, 110, 680 N.E.2d 32 (1997).

---

**2.** For example, it is clear that the definition of employer in Mass. Gen. L., ch. 149, § 150C does not include corporate officers. *See Commonwealth v. Cintolo,* 415 Mass. 358, 359, 613 N.E.2d 509 (1993) (interpreting statute in a criminal context). Thus, an employee could not file a civil action against such an officer, pursuant to Mass. Gen. L., ch. 149, § 150, for a violation of Section 150C. Nahigian at-tempted to file a Section 150C action against officers in this case, with his second and third counts (failure to pay insurer or place money in health account). Ordinarily this would compel dismissal, but not in a case of "complete preemption." As will be seen below in Section III.C., the issue of allegedly "complete preemption" needs to be carefully considered.

There is virtually no law on this topic. However, one Massachusetts Superior Court case (the only case to truly consider this issue) has interpreted Section 150 (when suing to enforce Section 148) to incorporate Section 148's broad definition of employer. In *York v. On–Site Communications*, 2000 WL 1511405, *3 (Mass.Super.2000) (Kottmyer, J.), the court held that an employee could sue a company officer civilly (under Section 150) for violating Section 148. In reaching this conclusion, it used the definition of employer from Section 148. *Id.; see also Dunfey v. Primetech Prof'l Servs., Inc.*, 2002 WL 388196, *2–3 (Mass.Super.2002) (Houston, J.) (allowing employee to sue corporate officers under Section 150 for violating Section 148 without making any comment on the definitional issue). *Cf. Kohli v. Res Engineering, Inc.*, 2000 WL 1876605, *3 (Mass.Super.2000) (Garsh, J.) (noting that even though a corporate officer is an employer within the meaning of Section 148, that does not mean that she is not also an employee within the meaning of that section who is entitled to sue for violations of Section 148 under Section 150). As there is no contrary authority, it appears that Massachusetts law applies the broad definition of employer from Section 148 (which includes corporate officers) to suits by employees under section 150 to remedy violations of section 148.

■ Moreover, basic principles of statutory interpretation support this conclusion. Where the language of a statute is clear and unambiguous, that statute must be interpreted according to the plain meaning of its terms. *See Town of Milford v. Boyd*, 434 Mass. 754, 757–58, 752 N.E.2d 732 (2001). This rule must be followed even if, for example, a statute is in derogation of the common law. *See Falmouth Ob–Gyn Assocs., Inc. v. Abisla*, 417 Mass. 176, 179, 629 N.E.2d 291 (1994) (noting that although statutes derogating from the common law are usually strictly construed, statutory interpretation should always follow the intent of the legislature if that intent is clear). Here, the language of the statutory scheme is clear. Section 148 makes it a crime for employers, defined to include corporate officers, not to pay wages owed to their employees. The last paragraph of section 150, which was added in 1993, after Section 148 and other parts of Section 150 itself, states,

> [a]ny employee claiming to be aggrieved by a violation of section 148, 148A, 148B, 150C, 152, 152A or 159C or section 19 of chapter 151 may, at the expiration of ninety days after the filing of a complaint with the attorney general, or sooner, if the attorney general assents in writing, and within three years of such violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorney fees.

Mass. Gen L., ch. 149, § 150.

Notably, the word "employer" is not defined or even used within the relevant paragraph of Section 150. Instead, the paragraph simply states that "any employee claiming to be aggrieved by a violation of section 148" can prosecute a civil action. Mass. Gen. L., ch. 149, § 150. The plain meaning of this clause, absent some special limiting language narrowing the class that can be sued, is to allow a employee to sue anyone who violates Section 148. Since corporate officers can violate Section 148 (as they fall within its definition of employer), it follows that they can be sued under Section 150.

■ A second canon that applies to this case is that if a sensible construction

is available, statutes should not be read to achieve an absurd result. *Flemings v. Contributory Ret. Appeal Bd.*, 431 Mass. 374, 376, 727 N.E.2d 1147 (2000). Byrd and Tvrdik's interpretation of Section 150 would produce absurd results for two reasons.

First, Section 150 does more than establish a civil remedy for employees; it also lays out the procedure by which the attorney general can file a criminal complaint for violations of Section 148 and it limits the types of defenses that can be raised by employers at criminal trials for violating Section 148. Mass. Gen. L., ch. 149, § 150. Likewise, Section 149 establishes a second criminal enforcement scheme, whereby the employee herself, without the intermediary acts of the attorney general, swears out a criminal complaint against the employer for violating Section 148, Mass. Gen. L., ch. 149, § 149, while Section 27C establishes punishment for criminal violations of Section 148, Mass. Gen. L., ch. 149, § 27C. In short, Section 148 only defines the crime of failing to pay wages; various other sections establish the details of enforcement. Yet Sections 149 and 27C, like Section 150, contain no definition of the term "employer." Under the defendants' interpretation, all of Section 150 (as well as Sections 149 and 27C) would need to be read to exclude corporate officers from the definition of "employer." Thus, corporate officers would be criminals, but they could not be prosecuted either by the attorney general or an employee, nor could they be bound by the same limitations on the types of defenses that they could raise. Only corporations themselves would be bound by these provisions. This is an absurd result; it is more sensible to read all of Section 150 (as well as Sections 149 and 27C) to incorporate the definition of employer given in Section 148 whenever en-

forcing Section 148. Thus, and clearly, corporate officers are subject to the criminal procedures, defenses, and civil suits established in Section 150 for violations of Section 148.

There is also a second way in which Byrd and Tvrdik's interpretation of Section 150 would lead to absurd results. The civil enforcement paragraph of Section 150 establishes a remedy for more than just Section 148—it also establishes such a remedy for six other provisions both inside and outside of Chapter 149. Mass. Gen. L., ch. 149, § 150. Not all of these provisions use the same expansive definition of "employer" as section 148. For example, section 150C does not include corporate officers within its purview. *See Cintolo*, 415 Mass. at 359, 613 N.E.2d 509 (interpreting statute in a criminal context). It would have been unwieldy and absurd for the legislature to define who was an employer for the purpose of civil liability after listing each and every one of the seven provisions for which it established a civil cause of action. The reference to seven distinct provisions also explains why the legislature could not have used the approach that it used in Section 27 of the chapter and that defendants suggested could have been used here. In Section 27, a special, broad definition of employer (including corporate officers) is given, and the language states that it applies "within the meaning of sections 26 to 27B, inclusive." Mass. Gen. L., ch. 149, § 27. The legislature was unable to use the same tactic with Section 148, stating for example that its definition of employer applied to "both sections 148 and 150," because many of the other provisions for which civil liability is created by Section 150 do not share Section 148's definition of employer.[3]

By establishing a cause of action for "any employee claiming to be aggrieved by

**3.** A more complex approach could have been used, however. For example, Section 148

a violation" of those seven provisions, the legislature avoided defining employer at all within Section 150, and instead referenced the various definitions of employer given in each of the seven provisions themselves. Mass. Gen. L., ch. 149, § 150. In other words, any entity that could violate a given provision could be civilly liable for that violation under Section 150. Byrd and Tvrdik's argument that inclusion of specific language within one section of a statute generally excludes it from another section where it has been omitted, although correct, is unavailing where the second section (Section 150) is intended to incorporate the definition given in the first section (Section 148).

## 2. Exhaustion of Administrative Remedies

█ Byrd and Tvrdik also allege that the state law claim against them must be dismissed because of Nahigian's failure to exhaust the administrative remedies required by the state statute. Section 150 states that civil suits for violations of Section 148 may only be filed "at the expiration of ninety days after the filing of the complaint with the attorney general, or

sooner, if the attorney general assents in writing, and within three years ...." Mass. Gen. L., ch. 149, § 150. Byrd and Tvrdik admit that Nahigian filed a complaint with the attorney general and received authorization from the attorney general to proceed with the present lawsuit. They argue, however, that only Marketing Specialists and Leonard (not Byrd and Tvrdik) were named in the initial complaint, and thus this suit cannot be brought against Byrd and Tvrdik, because failure to name even a related party in an administrative complaint bars later court action.

Although there is again very little law in this area, Byrd and Tvrdik's argument must fail. First, all of the cases cited by Byrd and Tvrdik to support their proposition that failure to name even a related party in an administrative complaint compels dismissal of a later lawsuit spring from a different context: the requirement that plaintiffs wishing to file a civil action for discrimination under Mass. Gen. L., ch. 151B first file an administrative complaint with the Massachusetts Commission Against Discrimination. *E.g., Powers v. H.B. Smith Co.*, 42 Mass.App.Ct. 657, 667, 679 N.E.2d 252 (1997).[4] A recent Superior

---

could have stated that its definition of employer applied "in Section 148 and in Section 150 when discussing criminal actions and civil suits to enforce Section 148."

4. Even in the Massachusetts Commission Against Discrimination context, failure to name a related party as a respondent does not always compel dismissal of the action against the related party. Federal district courts have held that failure to name a related party does not compel dismissal if the party's conduct is put at issue and she is put on notice and able to participate in the Massachusetts Commission Against Discrimination investigation, thus having an opportunity to conciliate the charge before any lawsuit. *See Chapin v. Univ. of Mass. at Lowell*, 977 F.Supp. 72, 76 (D.Mass.1997) (Lindsay, J.). In dicta, the Massachusetts Appeals Court suggested without deciding that this was the proper ap-

proach. *See King v. First*, 46 Mass.App.Ct. 372, 374–75, 705 N.E.2d 1172 (1999). Since *King*, various Superior Court decisions have applied the *Chapin* approach. *See, e.g., Turley v. Sec. Integration, Inc.*, 2001 WL 1772023, *7 (Mass.Super.2001) (Borenstein, J.); *Fuer v. Congregation of Sisters of St. Joseph of Boston, Inc.*, 1999 WL 1319000, *4 (Mass.Super.1999) (Gants, J.). In this case, though, there is no evidence that the conduct of either Byrd or Tvrdik was put at issue by the initial complaint to the attorney general, nor is there any evidence that they had actual notice of the complaint or an opportunity to participate in any investigation. Indeed, both Byrd and Tvrdik state in their affidavits that they were given no notice of any administrative complaint made against them by either Nahigian or the Attorney General. Byrd Aff., ¶ 10, Tvrdik Aff., ¶ 13.

Court decision (the only court to consider the exhaustion of remedies issue with respect to Section 150) has held that the purpose of the administrative requirement in Section 150 is quite different from that of Chapter 151B. *Dunfey*, 2002 WL 388196 at *2. The purpose of requiring a complaint with the Massachusetts Commission Against Discrimination is to place potential defendants on notice and to give them an opportunity to conciliate any claims before any litigation. *See Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir.1996). The purpose of the Section 150 complaint must be different, because in Section 150, unlike in Chapter 151B, there is no requirement that the administrative agency receiving the complaint actually investigate the charges made. *Dunfey*, 2002 WL 388196 at *2.

Indeed, the purpose of Section 150's administrative requirement, rather than giving potential defendants notice and an opportunity to conciliate, seems to be to give the *Attorney General* notice that a crime (failure to pay wages) may be occurring. *Id.* Thus, a "more lenient standard of scrutiny" can be used for assessing the naming of related parties: the complaint is adequate, even if it does not name all the related parties who will be sued, so long as it describes the substance of the crime (non-payment of wages) that has been committed. *Id.* This approach is particularly sensible when one considers that the Section 148/150 complaint form does not indicate that a plaintiff list all potential parties to a suit, but asks only for an employer and the manager and president of that employer. *Id.* at *3, n. 3. Since

Nahigian filed an initial complaint in this case and appears to have described the substance of the crime, the failure to name Byrd and Tvrdik does not mandate dismissal of the action against them.

The *Dunfey* court did indicate, in dicta, that even if it applied a standard that resembled the discrimination standard, the unnamed defendants would meet that standard because they had constructive notice of the administrative complaint. *Id.* at *3. The court stressed that the unnamed parties (a subsidiary of the named party and an employee of that named party) had an ongoing relationship with the named party during and after the time the complaint was filed. Similarly, if this "constructive notice" standard were used in this case (although it makes little sense to use it because the Attorney General is not obligated to investigate the incident or notify named parties), Byrd and Tvrdik would have constructive notice because the facts alleged indicate that they had an ongoing relationship with the company during and after the time the complaint was filed.[5] Accordingly, their argument must fail.

## C. Subject Matter Jurisdiction— Rule 12(b)(1)

Although neither party raised this issue, the factors giving this court subject matter jurisdiction over this case upon removal from state court are not self-evident and must be explored. Indeed, in the course of examining the issues involved in the Rule 12(b)(2) and Rule 12(b)(6) motions, this Court began to have grave doubts about its subject matter jurisdiction.

---

**5.** With respect to Tvrdik, it is uncontested that she was with Marketing Specialists until October 2001, six months after the first complaint was filed in June 2001. Tvrdik Aff., ¶ 8. The Attorney General filed his response allowing Nahigian to bring this action on November 30, 2001. Am. Compl., ¶ 19 (Ex. 1 to Notice of Removal, [Docket No. 1]). Byrd states in his affidavit that he left his officer's post with Marketing Specialists in May 2001, before the administrative complaint was filed. Byrd Aff., ¶ 3. Nahigian, however, presents evidence that Byrd still held substantial power within the Marketing Specialists after that date as a key Richmont partner. Pl's Opp'n at 5–6.

Thus, on July 26, 2002, the Court issued an order giving all parties thirty days to brief this issue. The following discussion of this Court's subject matter jurisdiction in the present case benefits from that briefing.

▮▮▮ Ordinarily, preemption by federal law is simply a defense to a state law claim and not a basis for removal to federal court because of the well-pleaded complaint rule. *Metro. Life Ins. Co.*, 481 U.S. at 63, 107 S.Ct. 1542. In certain areas, however, Congress has demonstrated such a strong intent to preempt that *any* claims brought in that area (even if purportedly raising only state law claims) are necessarily federal in character and may be removed. This is known as complete preemption. *Id.* at 63–64, 107 S.Ct. 1542.

▮▮▮ In the ERISA context, state law claims are completely preempted and thus removable if and only if: 1) they are preempted by ERISA because they "relate to" an employee benefit plan, (29 U.S.C. § 1144, and 2) they fall "within the scope" of Section 502(a) of ERISA, (29 U.S.C. § 1132(a)) i.e. ERISA's exclusive civil enforcement provision. *Id.* at 64, 107 S.Ct. 1542. Nahigian's second and third claims meet this first criterion because they relate to employee benefit plans and are thus preempted by ERISA. They do not, however meet second requirement for complete preemption—that the claim fall within the scope of Section 1132(a). Nahigian would lack standing to file suit under section 1132(a) because he was not a participant in the benefit plan. Thus, his state law claims cannot fall within the scope of the provision, as will be shown below.

### A. Nahigian Lacks Standing to File a Section 1132(a) Claim.

▮▮▮ Section 1132(a) claims can only be filed by four types of individuals: participants, beneficiaries, fiduciaries, and the Secretary of Labor. *See* 11 U.S.C. § 1132(a). To have standing, Nahigian must have fit into one of these four categories at the time the action was brought, and must retain that status throughout the pendency of the lawsuit. Nahigian's status at the time the injury allegedly occurred is not relevant to the standing issue. *See Crawford v. Lamantia*, 34 F.3d 28, 32 (1st Cir.1994).

Nahigian is not the Secretary of Labor, nor is he a fiduciary for the health plans. Nahigian is also not, and never was, a plan beneficiary. ERISA defines a beneficiary as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8). In other words, Nahigian's dependents— not Nahigian himself—would be beneficiaries.

If anything, Nahigian, as a former employee, would have standing as a participant. A participant is defined as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). Clearly, Nahigian *was* a participant in Marketing Specialists' health insurance plan when he worked at Marketing Specialists. The question is whether he is still a participant as an ex-employee of the corporation.

The United States Supreme Court has interpreted the ERISA definition of participant to include: "employees in, or reasonably expected to be in, currently covered employment, or former employees who have ... a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Firestone Tire and Rubber Co. v. Bruch,*

489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (internal quotation marks and citations omitted). This definition was not generated within a standing context. *See Vartanian v. Monsanto Co.,* 14 F.3d 697, 701 (1st Cir.1994). Rather, the case sought to determine whether an employer was liable under 29 U.S.C. § 1132(c)(1), which establishes liability for failing to supply requested plan information to a "participant or beneficiary." The employer admitted that it had refused to give requested information about the plan to an individual, and thus the only question was whether that individual was a participant when suit was filed.

When applying the Supreme Court's definition of participant in the standing context, the First Circuit's approach has evolved. In *Vartanian v. Monsanto Co.,* 14 F.3d 697, 701 (1st Cir.1994) the court emphasized that *Firestone* was developed outside of a standing context and thus did not have to be followed in a standing inquiry. The court then adopted the Sixth Circuit's solution to the standing issue, noting that the jurisdictional limitations within ERISA are meant to be broadly interpreted because of its remedial nature (it is meant to reduce, not expand, jurisdictional and procedural obstacles). *Id.* at 701–02. It adopted a broad test for standing: "The ultimate question is whether the plaintiff is within the zone of interests ERISA was intended to protect." *Id.* (quoting *Astor v. International Business Machines Corp.,* 7 F.3d 533, 538–39 (6th Cir.1993)). In defining this "zone of interests," the court cited the legislative history of the act and noted that the purpose of ERISA's civil enforcement provision is to provide the full range of remedies and remove jurisdictional obstacles that have hampered effective enforcement of fiduciary responsibilities and recovery of benefits due. *Id.* at 702. Applying this "zone of interests" test, the court allowed a former employee of a company who had no plans

to return to his company and had already received all of his pension benefits (in one lump sum distribution) to sue as a participant. *Id.* at 702. Employers, the court noted, should not be able to defeat standing through their own wrongful acts. *Id.* at 703.

The First Circuit's subsequent decision in *Crawford v. Lamantia,* 34 F.3d 28 (1st Cir.1994), decided very shortly after *Vartanian,* cut back sharply on *Vartanian*'s broad approach to ERISA standing by emphasizing literal compliance with the *Firestone* definition of participant in a standing context. In *Crawford,* an ex-employee sued his employee stock option plan, claiming breach of fiduciary duty. The employer had made a loan to the plan for use to buy a set number of shares of the employer's stock (which would then be given to qualifying employees). *Id.* at 30. The employer agreed to give the plan enough money every quarter to pay the accrued principal and interest on the loan. *Id.* In essence, the employer was giving the pension plan the money needed to pay the employer back for its loan. The ultimate beneficiary of the transaction was the employees, because the company was essentially funding stock purchases for them. The ex-employee, after receiving his lump-sum distribution of stock, alleged that the stock option plan had paid too much for the employer's stock. *Id.* at 30–31. The court applied the *Firestone* definition literally, and held that the ex-employee lacked standing as a participant because he was an ex-employee (with no prospect of returning to covered employment) who had no claim for *vested benefits. Id.* at 32–33. The root issue was that the employer's alleged overpayment caused the ex-employee no loss of benefits at all—the loan money was used by the plan to buy a *set number* of the employer's shares, and thus if the shares had been correctly valued, the plan would simply have taken out a

smaller loan and purchased the same amount of shares. *Id.* at 33. Under no circumstances would the loan money that was saved as a result have been distributed to the employees (instead, the company would have kept the money). *Id.* Thus, because the ex-employee in *Crawford* had no claim for vested benefits (indeed, he had no claim for benefits at all), he lacked standing because he did not fit the *Firestone* definition of participant. *Id.*

*Crawford*'s impact on *Vartanian* is somewhat uncertain. Indeed, *Crawford*, rather than overruling *Vartanian*, weakly distinguished it by saying that *Vartanian* "did not involve a situation, as here, where the plaintiffs could not establish that they were former employees with a colorable claim to vested benefits when faced with a motion for summary judgment." *Crawford*, 34 F.3d at 33 n. 7 (quoting *Vartanian*, 14 F.3d at 702–03 n. 4) (internal quotation marks omitted).

It is unclear what the court meant by this, other than that the *Crawford* decision occurred on a motion for summary judgment, while the *Vartanian* decision occurred on a Rule 12(b)(6) motion to dismiss. One of my colleagues has applied *Vartanian*'s expanded definition for standing purposes, notwithstanding *Crawford*. *See Sotiropoulos v. Travelers Indem. Co. of Rhode Island,* 971 F.Supp. 52, 54–55 (D.Mass.1997) (Ponsor, J.) (allowing ex-employee, with no prospects of returning to covered employment, to sue for long-term disability benefits accrued after she was allegedly wrongfully terminated from the plan, and thus technically not vested); *Duncan v. Santaniello,* 900 F.Supp. 547, 556–57 (D.Mass.1995) (Ponsor, J.) (allowing *former* fiduciaries of plan, who have been sued by beneficiaries for breach of fiduciary duty, to sue other former fiduciaries for contribution, noting that this serves ERISA's purpose of enforcing fiduciary responsibilities). For the most part, however, since *Crawford*, *Vartanian* has generally been read narrowly, as creating an exception to the *Firestone* definition of participant only in cases, as in *Vartanian*, where the employee would still be a participant in the plan (and thus entitled to higher benefit levels) but for the employer's malfeasance. *See, e.g., Boucher v. Williams,* 13 F.Supp.2d 84, 103 (D.Me.1998), In this case, it is immaterial whether the *Crawford* or *Vartanian* approach is applied, because Nahigian lacks standing either way.

Under the *Crawford* approach, Nahigian lacks standing because he does not currently fit under any of the three prongs of the *Firestone* definition. First, he is not currently an employee of Marketing Specialists. Second, he has no prospects of returning to covered employment with Marketing Specialists (the company no longer exists). Third, he is not an ex-employee with a colorable claim for vested benefits. Indeed, Nahigian states no claim *for benefits* at all. He alleges that during a single two week pay period (his last with Marketing Specialists), his employer failed to forward money to a health insurance provider and to a flexible spending account. He does not allege that this caused him any reduction in his health insurance benefits (i.e. that treatments he received were left uncovered because his health insurance coverage was cancelled). Unlike pension plans where the benefits that the employee expects come directly from the money placed into the plan by the employer, with health insurance plans (employee welfare plans), the benefit expected by the employee is not the money that the employer pays into the plan to buy insurance, but rather the money that comes via insurance coverage to pay for various treatments. *See Larocca v. Borden, Inc.,* 276 F.3d 22, 29 n. 8 (1st Cir.2002) ("[T]he benefit due from an insurance plan is the benefit paid in case a covered event occurs,

not the coverage itself."). Here, Nahigian has not alleged any uncovered treatment; he simply wishes to recover the money that his employer failed to forward to his health insurer. And, indeed, one can recover such money under the state law claims that Nahigian initially raised. *See* Mass. Gen. Laws ch. 149, § 150C. Nevertheless, because this money is not a "benefit," it does not, under the *Crawford* approach, make Nahigian a "participant" for standing purposes.[6]

Nahigian also lacks standing under the *Vartanian* approach, which emphasizes ERISA's "zone of interests." 14 F.3d at 701. Nahigian does not fall within this zone of interests because he does not allege any injury that ERISA is designed to remedy. As noted above, in defining ERISA's "zone of interests," the *Vartanian* court referred to legislative history indicating that ERISA's purpose was to reduce jurisdictional and procedural obstacles to the enforcement of fiduciary responsibilities and the recovery of benefits due to participants. *Id.* at 702.

Accepting as true the facts in Nahigian's complaint, Nahigian's former employer did breach its fiduciary duty towards plan participants by not paying money owed into the plan, and in this sense Nahigian's case has some connection with ERISA's zone of interests. This breach, however, did not cause Nahigian any injury that concerned ERISA, as there is no allegation that he was denied coverage for any treatments that he may have undergone during that two-week period. Because ERISA is concerned primarily with ensuring that employees receive benefits due to them, an employee usually cannot recover under ERISA—even if there has been a breach of fiduciary duty—unless the breach caused some reduction in her benefits. *See Larocca,* 276 F.3d at 28–29 (holding that if the employee is still a member of a health insurance plan, he must sue for health insurance benefits under Section 1132(a)(1) and cannot sue for equitable relief—in this case unjust enrichment—under Section 1132(a)(3) for money that the employer retained and failed to forward to a health insurer);[7] *Mira v. Nuclear Measurements*

---

**6.** There is one very important caveat: the above analysis has assumed that the flexible spending plan essentially works the same way as a regular health insurance plan. The Court has assumed that the money within the flexible spending account could only be used for health coverage (otherwise it would be forfeited). This is not spelled out in Nahigian's complaint or in any other document in the record, but it is generally the way the flexible spending accounts work. But if, for example, it comes to light that the money placed into the flexible spending account could be used not only for health coverage expenses, but also for a pension plan, then the above analysis would be wrong. With a pension plan, an employee's benefits (the pension fund) are directly reduced if the employer does not place the correct amount of money into the plan, and thus a suit to recover the amount that Marketing Specialists improperly failed to put into the plan would be a suit for benefits. Thus, Nahigian would fall under the

*Firestone* definition of participant and would have standing to sue under Section 1132(a).

**7.** Note, though, that if an employee is no longer a member of the plan and the plan no longer exists, and thus Section 1132(a)(1) relief for benefits is no longer possible, the *Larocca* court suggests that equitable relief for unjust enrichment under Section 1132(a)(3) (i.e. return of money that the employer failed to forward to the health insurer) would be appropriate, because (a)(3) is intended as a catch-all provision. *Id.* Still, the court indicates that such ERISA relief should be oriented towards benefits whenever possible. *Id.* at 29 (noting that even if an employee no longer belongs to the health insurance plan, as long as the plan itself still exists the appropriate remedy is for the employee to be reinstated to the plan, and then for the employee to receive money for any treatment coverage that was withheld when the employee was wrongfully terminated from the plan).

*Corp.*, 107 F.3d 466, 471–73 (7th Cir.1997) (holding that even though employer breached fiduciary duty by using money earmarked for health insurance plans to pay other company expenses, employees were not entitled to recovery under Section 1132(a) because the employees were reimbursed for any claims filed during the period that their coverage was cancelled).

Nahigian's claims are actually very similar to those found in *Crawford*, in that both Nahigian and Crawford allege a breach of fiduciary duty by their employers, but neither allege any change in *their* benefits as a result of the breach. *See Crawford*, 34 F.3d at 33. Therefore, because Nahigian is not a participant under the *Firestone* definition of the term, nor does he fall within ERISA's zone of interests, he lacks standing to file a claim under ERISA's civil enforcement provision, Section 1132(a).

**B. Nahigian's Lack of Standing to File an 1132(a) Claim Means that His Claims are not Completely Preempted by ERISA.**

 Ordinarily, when a plaintiff brings a claim, that plaintiff requires standing in order for the court to have subject matter jurisdiction. *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir.1996); *see also Crawford* 34 F.3d at 32 (noting in the ERISA context that standing "goes to the very power of the court to act."). Thus, if Nahigian had brought counts two and three of his complaint as ERISA claims, his lack of standing would clearly have compelled dismissal for lack of subject matter jurisdiction.

The actual case before this court, however, is more procedurally complex. Nahigian's second and third counts were brought as state claims, not federal claims, only to be removed on the basis of complete preemption. As noted above, complete pre-

emption requires that 1) the plaintiff's state law claims be preempted by ERISA, and 2) the plaintiff's state law claims fall "within the scope" of Section 1132(a) of ERISA, the statute's exclusive civil enforcement provision. *Metropolitan Life Ins. Co.* 481 U.S. at 64, 107 S.Ct. 1542; *see also Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 5 (1st Cir.1999) (noting that this question of scope is determined by whether the state law claim can be "properly characterized as an alternative enforcement mechanism [of ERISA 1132(a) ]."). The issue here is thus whether Nahigian's lack of standing, as described above, renders him outside the scope of Section 1132(a). This Court holds that it does.

It is true that courts in several circuits have upheld removal jurisdiction on the basis of the doctrine of "complete preemption" even in cases where relief was obviously unavailable under Section 1132(a). In *Romney v. Lin*, 94 F.3d 74, 77 (2d Cir.1996), for example, the plaintiff attempted to sue under a state law statute that imposed liability on a corporation's shareholders for the fiduciary breaches of the corporation in failing to make contributions to employee benefit plans. The court stated that Romney's claims were completely preempted by ERISA and removal was proper, even though ERISA does not impose liability on the shareholders for the corporation's fiduciary lapses. *Id.* at 80–81. In reaching this conclusion, the court emphasized the purpose of Section 502(a), which was to act as the exclusive civil remedy for ERISA claims and impose uniformity on employee benefit law. *Id.* It explained that permitting removal furthers these purposes by making inconsistent state law claims less likely to survive. *Id.* The court further noted that Section 1132(a) already provided a remedy that plaintiff could pursue for breaches of fiduciary duty (against the corporation or per-

haps its officers); it just did not provide a remedy against the given people (the shareholders) that the plaintiff wanted to sue. *Id.* at 81. Similarly, the court in *Wood v. Prudential Ins. Co. of America,* 207 F.3d 674, 678 (3d Cir.2000) held that "a state law claim may fall within Section [1132(a) ] and thus be completely preempted even if the plaintiff asks for relief that is not available under Section [1132(a) ]." In *Wood,* a plaintiff asked for compensatory damages (rather than benefits) after he was allegedly improperly terminated from his health care plan, and the court held that his claim was completely preempted. *Id.* at 679. The *Wood* court stressed that allowing the claim to go forward in state court would undermine Congress's careful choice of remedies in Section 1132(a). *Id.*

Interestingly, in both *Romney* and *Wood,* the plaintiffs possibly lacked even "colorable" claims for relief under Section 1132(a) because relief was so obviously unavailable under the provision. Ordinarily, when a plaintiff sues under a federal statute, a plaintiff needs to assert at least a "colorable claim" under that statute (defined essentially as an "arguable" claim) to establish a federal court's (federal question) subject matter jurisdiction. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is not 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.' ") (quoting *Oneida Indian Nation of New York v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974)); *see also IUE AFL–CIO Pension Fund,* 9 F.3d at 1055–1056. Implicitly, then, the *Romney* and *Wood* courts seem to have been holding that the "under the scope" of Section 1132(a) language that establishes complete preemp-

tion jurisdiction is broader than the ordinary jurisdiction that a plaintiff would have when bringing her own suit directly under Section 1132(a). The justifications for this broader jurisdictional sweep are the unique concerns of ERISA removal (which led the Supreme Court to apply the complete preemption doctrine to the ERISA statute in the first place), particularly the strong need for legal uniformity in the area.

■ *Romney* and *Wood,* however, do not speak to situations where a when a plaintiff lacks *standing* to file suit under Section 1132(a). Indeed, there is a fundamental difference between situations (like those in *Romney* and *Wood* ) where the plaintiff is the right person to bring the action, but is seeking the wrong type of relief or the right relief from the wrong person, and situations where (as here) the plaintiff is simply the wrong person to bring the action in the first place. Standing (both constitutional and statutory) is traditionally a jurisdictional issue, in contrast to other questions as to whether a federal statute creates a given claim for relief, which implicate the merits of the plaintiff's case. *Steel Co.,* 523 U.S. at 88–89, 118 S.Ct. 1003. at 92. Accordingly, a different approach is in order. This Court holds that where the plaintiff could not possibly bring a Section 1132(a) action because of his lack of *standing,* his suit does not fall within the scope of 1132(a), and complete preemption does not apply.

This holding is consistent with the conclusions of several other circuits, which have also held (albeit with little discussion) that if a plaintiff lacks standing to sue under Section 1132(a), his state law claims are not completely preempted because they do not fall under the scope of Section 1132(a), and the action must be remanded to state court. *See Hobbs v. Blue Cross Blue Shield of Ala.,* 276 F.3d 1236, 1240

(11th Cir.2001); *Ward v. Alternative Health Delivery Sys.*, 261 F.3d 624, 627 (6th Cir.2001); *Harris v. Provident Life and Accident Ins. Co.*, 26 F.3d 930, 934 (9th Cir.1994).

Thus, the Court's holding that Nahigian lacks standing to sue under Section 1132(a) compels a holding that Nahigian's Counts 2 and 3 are not completely preempted by ERISA. The case must be remanded to the courts of Massachusetts because this Court lacks subject matter jurisdiction.

## IV. CONCLUSION

This Court lacks subject matter jurisdiction over this case. Nahigian does not have standing to sue under Section 1132(a) because he was not a "participant" in a plan at the time of filing suit. Nahigian's lack of standing, in turn, means that the case is not under the scope of Section 1132(a) and thus is not completely preempted by ERISA. Removal to this Court was therefore improper because federal courts lack subject matter jurisdiction over this dispute. This action ought be, and therefore is, REMANDED to the Massachusetts Superior Court sitting in and for the County of Norfolk.[8]

---

**8.** In light of this resolution, the discussion of Byrd and Tvrdik's 12(b)(6) motion to dismiss for failure to state a claim is mere dicta. *See Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003 (holding that merits cannot be decided where subject matter jurisdiction is lacking). Technically, the Court could rule on Byrd and Tvrdik's 12(b)(2) motion to dismiss for lack of personal jurisdiction. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585–88, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). The issues involved in the personal jurisdiction motion, however, are rather complex, and Nahigian has asked for discovery on the personal jurisdiction issue. Of course, Nahigian cannot use

---

ERISA's nationwide service of process provision to get personal jurisdiction over Byrd and Tvrdik once his case has been remanded for lack of subject matter jurisdiction. Thus, the issue before the Superior Court will be whether jurisdiction can be asserted via the Massachusetts Long Arm statute, and whether this assertion of jurisdiction comports with due process.