GIOVANI DEPIANTI & others[1] vs. JAN-PRO FRANCHISING
INTERNATIONAL, INC.

Suffolk. February 5, 2013. - June 17, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Labor,* Wages. *Massachusetts Wage Act. Independent Contractor Act. Contract,*
Franchise agreement, Employment. *Statute,* Construction. *Attorney General.*
*Administrative Law,* Exhaustion of remedies.

Under G. L. c. 149, § 150, a plaintiff's failure to file a complaint with the At-
torney General before initiating a private action alleging a violation of
G. L. c. 149, §§ 148-150, does not deprive a court of jurisdiction, where,
if the Attorney General is notified of the action during its pendency, such a
procedural defect does not substantially interfere with the statute's purpose
of providing notice. [611-614]
A franchisor is vicariously liable for the conduct of its franchisee only where
the franchisor controls or has the right to control the specific policy or
practice resulting in the harm to the plaintiff. [614-617]
A contract between the parties is not a necessary element to a claim for
employee misclassification under G. L. c. 149, § 148B, the independent
contractor statute, in that the statute contains no language limiting its ap-
plication to circumstances where a contract exists; and in that holding
otherwise would defeat the statute's purpose of protecting workers by classi-
fying them as employees, where the circumstances indicate that they are, in
fact, employees. [617-625] CORDY, J., dissenting in part.

CERTIFICATION of a question of law to the Supreme Judicial
Court by the United States District Court for the District of
Massachusetts.

*Shannon Liss-Riordan (Stephen S. Churchill* with her) for the
plaintiffs.

*Jeffrey M. Rosin (Christopher M. Pardo* with him) for the
defendant.

*Benjamin B. Reed & James C. Rubinger,* of Virginia, for
International Franchise Association, amicus curiae, submitted a
brief.

[1] Hyun Ki Kim, Kyu Jin Roh, Gerardo Vazquez, Gloria Roman, Juan Aguilar,
Nicole Rhodes, Mateo Garduno, Chiara Harris, and Todor Sinapov.

*Catherine Ruckelshaus,* of New York, *Eunice Hyunhye Cho,* of California, & *Audrey Richardson* for Brazilian Immigrant Center & others, amici curiae, submitted a brief.

LENK, J. Giovani Depianti, a janitorial cleaning services franchisee, along with franchisees from other States, filed this putative class action in the United States District Court for the District of Massachusetts against the defendant, Jan-Pro Franchising International, Inc. (Jan-Pro). Depianti alleges, inter alia, that Jan-Pro misclassified him as an independent contractor, see G. L. c. 149, § 148B, and committed various wage law violations. A judge of the United States District Court for the District of Massachusetts certified the following questions to this court, pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):

> "[1.] Whether a plaintiff's failure to exhaust administrative remedies pursuant to [G. L. c. 149, § 150,] by filing a complaint with the Attorney General deprives a court of jurisdiction to consider the plaintiff's claims under [G. L. c. 149, §§ 148, 148B, and 150,] and under [G. L. c. 151, §§ 1 and 1A].

> "[2.] Whether and how to apply the 'right to control test' for vicarious liability to the franchisor-franchisee relationship. . . .

> "[3.] Whether a defendant may be liable for employee misclassification under [G. L. c. 149, § 148B,] where there was no contract for service between the plaintiff and defendant."

We answer the first question, "No." We answer the second question, "Yes," with further discussion concerning the application of the "right to control test" to the franchisor-franchisee relationship. We answer the third question, "Yes."[2]

1. *Background.* Jan-Pro is a Massachusetts corporation "in

---

[2]We acknowledge the amicus brief of the International Franchise Association, and the amicus brief of Brazilian Immigrant Center, Brazilian Women's Group, Centro Presente, Chelsea Collaborative, Chinese Progressive Association, Lawrence Community Connections, Massachusetts Coalition for Occupational Safety and Health, Massachusetts Immigrant and Refugee Advocacy Coalition, Massachusetts Jobs with Justice, Metrowest Worker Center, Project

the business of operating and franchising comprehensive cleaning and maintenance businesses." It sells regional rights to use the Jan-Pro brand to so-called "regional master franchisees." Upon purchasing these rights, regional master franchisees become the exclusive franchisors of the Jan-Pro brand within defined geographic areas. Regional master franchisees, in turn, sell the right to use the Jan-Pro brand to so-called "unit franchisees," who perform cleaning services for customers. Unit franchisees are provided with customer accounts by regional master franchisees, though unit franchisees may solicit additional business on their own. All customer accounts so obtained become the property of regional master franchisees.

Regional master franchisees invoice customers directly and receive payment for cleaning services rendered by unit franchisees. They deduct certain fees from the gross revenue collected and remit the balance to unit franchisees. They pay a portion of the fees deducted from the gross revenue to Jan-Pro, in the form of royalties.[3]

Depianti contracted with BradleyMktg Enterprises, Inc. (Bradley), a Jan-Pro regional master franchisee operating in Massachusetts, to purchase a Jan-Pro unit franchise.[4] He performed cleaning services under the Jan-Pro name from approximately June, 2003, through December, 2006. In 2008, he filed a putative class action against Jan-Pro in the United States District Court for the District of Massachusetts, alleging unfair and deceptive business practices in violation of G. L. c. 93A; misclassification as an independent contractor in violation of G. L. c. 149, § 148B; various wage law violations pursuant to G. L. c. 149, §§ 148 and 150, and G. L. c. 151, §§ 1 and 1A; intentional or negligent misrepresentation; quantum meruit; and unjust enrichment.[5] Depianti's claims of unfair and deceptive

Voice/American Friends Service Committee, and the National Employment Law Project.

[3]In its contracts with its regional master franchisees, Jan-Pro Franchising International, Inc. (Jan-Pro), requires that it be named a third-party beneficiary of all unit franchise agreements.

[4]Giovani Depianti did not contract directly with Jan-Pro.

[5]The other plaintiffs in the action are residents of other States and therefore allege violations of the statutory and common law of other jurisdictions. Accordingly, the certified questions before us implicate only Depianti's claims.

business practices and misrepresentation are based in part on alleged conduct of Bradley, not Jan-Pro, and therefore depend on Jan-Pro being held vicariously liable for the conduct of Bradley, its franchisee.[6] By contrast, Depianti's misclassification and wage claims allege direct, rather than vicarious, liability.

Jan-Pro sought summary judgment as to all claims, and Depianti moved for partial summary judgment on the misclassification claim. After a hearing on the parties' motions, the United States District Court judge stated his intention to certify the second and third questions, set forth *supra*, to this court, and invited comment by the parties.

Jan-Pro thereafter argued that the misclassification claim should be dismissed, because Depianti neglected to file a complaint with the Attorney General pursuant to G. L. c. 149, § 150 (§ 150),[7] before initiating his action, thereby failing to exhaust his administrative remedies.[8] The United States District Court judge determined that Jan-Pro had waived this argument by not raising it earlier in the litigation. However, pursuant to his independent obligation to ensure the United States District Court's jurisdiction, see *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990), the judge added the first question, set forth *supra*, to his certification order, to determine whether Depianti's failure to file a complaint with the Attorney General before bringing suit deprived the United States District Court of jurisdiction over his misclassification and wage claims.[9]

---

[6]Prior to filing his action against Jan-Pro, Depianti brought a proceeding against BradleyMktg Enterprises, Inc. (Bradley), before the American Arbitration Association, alleging nearly identical claims. The arbitration proceeding was later settled.

[7]In relevant part, G. L. c. 149, § 150 (§ 150), states:

> "An employee claiming to be aggrieved by a violation of sections . . . 148 [or] 148B . . . may, 90 days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within 3 years after the violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits."

[8]After Jan-Pro raised this argument, Depianti filed a complaint with the Attorney General and received a letter authorizing immediate private suit.

[9]In his certification order, the United States District Court judge also

2. *Discussion.* a. *Failure to file with the Attorney General.* The first reported question asks "[w]hether a plaintiff's failure to exhaust administrative remedies pursuant to [§ 150] by filing a complaint with the Attorney General deprives a court of jurisdiction to consider the plaintiff's claims under [G. L. c. 149, §§ 148, 148B, and 150,] and under [G. L. c. 151, §§ 1 and 1A]." To this question, we answer, "No."

Pursuant to § 150, an individual alleging a violation of G. L. c. 149, § 148 or 148B, may bring a private civil action ninety days after filing a complaint with the Attorney General, or sooner if the Attorney General assents to such suit.[10] Here, Depianti neglected to submit a complaint to the Attorney General before commencing his private action against Jan-Pro. As stated, however, the United States District Court judge ruled that Jan-Pro waived its objection to this procedural defect. Therefore, Depianti's failure first to file with the Attorney General is fatal to his misclassification and wage claims only if such failure deprives the United States District Court of jurisdiction. See *FW/PBS, Inc.* v. *Dallas, supra* (Federal court has independent duty to ensure its own jurisdiction).

In determining whether a procedural defect deprives a court of jurisdiction to hear a claim, we consider (1) to what extent the defect interferes with the "accomplishment of the purposes implicit in the statutory scheme," and (2) to what extent the opposing party can "justifiably claim prejudice." *Schulte* v. *Director of the Div. of Employment Sec.*, 369 Mass. 74, 79-80 (1975). Here, Depianti's failure to file a complaint with the Attorney General before initiating his action neither interfered with the accomplishment of the purposes implicit in § 150 nor prejudiced Jan-Pro.

The purposes implicit in § 150 are twofold. The first paragraph

welcomed our guidance on "any other questions of Massachusetts law deemed material to this case."

[10]The procedural requirements of § 150 do not pertain explicitly to claims brought under G. L. c. 151, §§ 1 and 1A. However, Depianti's claims under G. L. c. 151, §§ 1 and 1A, are predicated on his claim of misclassification under G. L. c. 149, § 148B. See G. L. c. 151, §§ 1, 1A (applying only to employees and not to independent contractors). Therefore, as the judge recognized, Depianti's claims under G. L. c. 151, §§ 1 and 1A, depend on the United States District Court's jurisdiction to consider his claim of misclassification.

of § 150 authorizes, but does not require, the Attorney General to bring criminal charges for alleged violations of G. L. c. 149, § 148, the wage statute. G. L. c. 149, § 150. The second paragraph permits an individual alleging violations of certain employment statutes to bring a private suit for damages, but requires that such individual first file a complaint with the Attorney General. *Id.* Thus, § 150 establishes a permissive, two-tiered framework for enforcement: it permits both criminal enforcement of wage violations and private civil enforcement of wage and other employment violations. See *id.* See also G. L. c. 149, § 27C (authorizing Attorney General to enforce various employment statutes, including G. L. c. 149, §§ 148 and 148B, and G. L. c. 151, §§ 1A and 1B, either civilly or criminally).

The Attorney General's right to enforce G. L. c. 149 and the right of private citizens to enforce provisions of that chapter represent parallel and distinct enforcement mechanisms. See *Melia v. Zenhire, Inc.*, 462 Mass. 164, 172 (2012). The requirement that a plaintiff file a complaint with the Attorney General before bringing a private suit is intended simply to ensure that the Attorney General receives notice of the alleged violations, so that she may investigate and prosecute such violations at her discretion. See *Nahigian v. Leonard*, 233 F. Supp. 2d 151, 164 (D. Mass. 2002) ("the purpose of Section 150's administrative requirement, rather than giving potential defendants notice and an opportunity to conciliate, seems to be to give the *Attorney General* notice that a crime [failure to pay wages] may be occurring"). In this way, the statute ensures that private actions for wage violations do not come and go without the Attorney General ever being made aware of the alleged unlawful conduct.

The Massachusetts antidiscrimination statute, G. L. c. 151B, offers a helpful contrast. That statute includes a similarly worded procedural requirement, permitting aggrieved individuals to bring private actions "at the expiration of ninety days after the filing of a complaint with the [Massachusetts Commission Against Discrimination (MCAD)], or sooner if a commissioner assents in writing." G. L. c. 151B, § 9. However, the filing of a complaint with MCAD triggers mandatory "prompt investigation" by that agency. G. L. c. 151B, § 5. After such investigation, if MCAD determines that there is probable cause to credit

the allegations, it shall "immediately endeavor to eliminate the unlawful practice complained of . . . by conference, conciliation and persuasion." *Id.* See *Melley* v. *Gillette Corp.*, 19 Mass. App. Ct. 511, 512 (1985). Where such efforts are unavailing, MCAD is to conduct a hearing on the matter, and may thereafter issue a cease and desist order or an order for affirmative relief, or impose civil penalties. G. L. c. 151B, § 5. If, at the expiration of ninety days after the filing of the complaint with MCAD, the complainant elects to bring a civil action for damages, "any complaint before the commission shall then be dismissed without prejudice, and the petitioner shall be barred from subsequently bringing a complaint on the same matter before the commission." G. L. c. 151B, § 9.

The purpose implicit in the antidiscrimination statute is to "resolve claims of discrimination with fairness and efficiency" via a "comprehensive remedial process." *Ryan* v. *Holie Donut, Inc.*, 82 Mass. App. Ct. 633, 639 (2012). In essence, the statute grants MCAD exclusive jurisdiction over claims of discrimination for ninety days, so that it may attempt to resolve such claims with greater flexibility and efficiency than may be had in a judicial forum. Therefore, where an individual brings a private suit pursuant to G. L. c. 151B without first filing with MCAD, the accomplishment of the purpose implicit in the statutory scheme is significantly obstructed. See *Schulte* v. *Director of the Div. of Employment Sec.*, *supra* at 80. For this reason, Massachusetts courts correctly have held that the filing requirement in the antidiscrimination statute is jurisdictional and that "[r]esort to the courts is not available for a complaint of discrimination within the jurisdiction of the MCAD unless the person claiming to have been the object of unlawful discrimination first makes a timely complaint to that agency." *Cherilla* v. *Phoenix Techs. Ltd.*, 32 Mass. App. Ct. 919, 919 (1992).

Section 150 stands in stark contrast to the antidiscrimination statute. It does not provide a comprehensive remedial scheme to resolve claims outside a judicial forum. Rather, § 150 authorizes two types of actions that may come before a court, one brought by the Attorney General, the other by individual plaintiffs. See G. L. c. 149, § 150. Further, unlike the filing requirement in the antidiscrimination statute, the filing requirement in § 150 trig-

gers no mandatory agency investigation or administrative adjudicatory action. While the filing requirement in the antidiscrimination statute operates as the necessary first step in a comprehensive remedial scheme, the filing requirement in § 150 operates merely to ensure that the Attorney General receives notice of potential employment violations.

Accordingly, we hold that failure to file a complaint with the Attorney General before initiating a private suit for alleged employment violations does not interfere with the accomplishment of the statutory purposes of § 150 to a substantial degree, at least where the Attorney General is notified of the suit during its pendency. See *Schulte* v. *Director of the Div. of Employment Sec., supra*. In such circumstances, the purposes implicit in the statutory scheme are effectively served, as the Attorney General may yet pursue enforcement action against the employer, even if the Attorney General was made aware of the alleged violations somewhat later than is anticipated under the statute. Moreover, a defendant cannot plausibly claim prejudice by the tardiness of the plaintiff's filing, at least where, as here, the plaintiff's suit would not have been time barred under the three-year limitations period included in G. L. c. 149, § 150, had he first filed with the Attorney General and waited ninety days before bringing suit against the defendant. See *Schulte* v. *Director of the Div. of Employment Sec., supra*. For these reasons, we conclude that Depianti's failure first to file a complaint with the Attorney General does not deprive the United States District Court of jurisdiction to consider his claims under G. L. c. 149, §§ 148, 148B, and 150, and G. L. c. 151, §§ 1 and 1A.

b. *Vicarious liability.* The second reported question asks "[w]hether and how to apply the 'right to control test' for vicarious liability to the franchisor-franchisee relationship." To this question, we answer "Yes," with the proviso that a court applying the "right to control test" in such circumstances should consider whether the defendant had the right to control the particular instrumentality of the plaintiff's asserted harm.

Pursuant to his G. L. c. 93A and misrepresentation claims, Depianti seeks to hold Jan-Pro vicariously liable for alleged conduct of Bradley. Generally, vicarious liability may be imposed where "the relation of master and servant existed at the time

the plaintiff was injured, whereby the . . . act of the servant was legally imputable to the master" (alteration in the original). *Cowan* v. *Eastern Racing Ass'n*, 330 Mass. 135, 141 (1953), quoting *Khoury* v. *Edison Elec. Illumination Co.*, 265 Mass. 236, 238 (1928). The test to establish the existence of such a relationship is whether the alleged master had "power of control or direction" over the alleged servant. *Kapp* v. *Ballantine*, 380 Mass. 186, 195 (1980). See Asia, Employment Relation: Common-Law Concept and Legislative Definition, 55 Yale. L. J. 76, 81 (1945) (emphasis on control is "in harmony with the notion of fault"). "It is not necessary that there be any actual control by the alleged master to make one his servant or agent, but merely a right of the master to control." *Cowan* v. *Eastern Racing Ass'n*, *supra*, quoting *Khoury* v. *Edison Elec. Illumination Co.*, *supra*.

This test is "not easily transferable to the franchise relationship." *Kerl* v. *Dennis Rasmussen, Inc.*, 273 Wis. 2d 106, 125 (2004) (*Kerl*). Franchisors, such as Jan-Pro, license their trademarks and brand identities to franchisees, such as Bradley. Under Federal law, a franchisor is required to maintain control and supervision over a franchisee's use of its mark, or else the franchisor will be deemed to have abandoned its mark under the abandonment provisions of the Lanham Act, 15 U.S.C. § 1064(5)(A) (2006). *Mini Maid Servs. Co.* v. *Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992). However, the controls that franchisors are required to maintain under the Lanham Act are not intended "to create a [F]ederal law of agency . . . [or to] saddle the licensor with the responsibilities under [S]tate law of a principal for his agent." *Oberlin* v. *Marlin Am. Corp.*, 596 F.2d 1322, 1327 (7th Cir. 1979), citing *Smith* v. *Cities Serv. Oil Co.*, 346 F.2d 349 (7th Cir. 1965), and *Murphy* v. *Holiday Inns, Inc.*, 216 Va. 490 (1975). Cf. *Torres* v. *Goodyear Tire & Rubber Co.*, 867 F.2d 1234, 1236-1237 (9th Cir. 1989) (tire company not vicariously liable for conduct of tire manufacturer that licensed company's mark, despite significant quality controls retained by company). Broadly extending the "right to control test" for vicarious liability to the franchisor-franchisee relationship, where franchisors are obligated to maintain certain controls, could have the undesirable effect of

penalizing franchisors for complying with Federal law. See Note, The Law of Franchisor Vicarious Liability: A Critique, 1993 Colum. Bus. L. Rev. 89, 99 (1993). For this reason, the "right to control test" should be applied to the franchisor-franchisee relationship in such a way as to ensure that liability will be imposed only where the conduct at issue properly may be imputed to the franchisor. See *Cowan* v. *Eastern Racing Ass'n, supra,* quoting *Khoury* v. *Edison Elec. Illumination Co., supra.*

In *Kerl, supra,* the Supreme Court of Wisconsin addressed an analogous situation. There, Robin Kerl and her fiancé, David Jones, were shot by Harvey Pierce, Kerl's former boy friend. *Id.* at 111. Kerl was seriously injured, and Jones was killed. *Id.* At the time, Pierce was a work-release inmate at a nearby jail, employed at a franchise restaurant operated by the defendant, Dennis Rasmussen, Inc. (DRI). *Id.* Pierce had left work without permission prior to the shooting. *Id.* Jones's estate and Kerl sued DRI, alleging negligent supervision of Pierce. *Id.* They also named DRI's franchisor as a defendant, on a theory of vicarious liability. *Id.*

The *Kerl* court held that "the marketing, quality, and operational standards commonly found in franchise agreements are insufficient to establish the close supervisory control or right of control necessary to demonstrate the existence of a master/servant relationship for all purposes or as a general matter." *Id.* at 113. Accordingly, the court applied a modified version of the "right to control test," concluding that a franchisor may be held vicariously liable for the conduct of its franchisee only if the franchisor controls or has a right to control "the daily conduct or operation of the particular 'instrumentality' or aspect of the franchisee's business that is alleged to have caused the harm." *Id.* at 129. Because the franchisor did not control or have a right to control DRI's supervision of its employees, the court concluded that the franchisor was not vicariously liable for DRI's negligent supervision. *Id.* at 135.

The "instrumentality" test adopted by the *Kerl* court accords with the approach of the majority of courts that have considered vicarious liability in the context of the franchise relationship. See, e.g., *Hong Wu* v. *Dunkin' Donuts, Inc.,* 105 F. Supp. 2d 83,

88 (E.D.N.Y. 2000) ("the franchisor typically is found to be vicariously liable only in situations where it exercised considerable control over the franchisee and the specific instrumentality at issue in a given case"); *Pizza K, Inc.* v. *Santagata*, 249 Ga. App. 36, 38-39 (2001) (no vicarious liability for collision caused by franchisee's delivery driver where franchisor had no supervisory authority over franchisee's employees); *VanDeMark* v. *McDonald's Corp.*, 153 N.H. 753, 763 (2006) (no vicarious liability for attack on franchisee's employee where franchisor had no authority to control franchisee's security operations).

Today we join these courts in concluding that a franchisor is vicariously liable for the conduct of its franchisee only where the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff. This test best serves the primary justification for the imposition of vicarious liability — namely, that liability should be imposed where a servant's conduct reasonably may be imputed to its master. See *Cowan* v. *Eastern Racing Ass'n*, *supra*, quoting *Khoury* v. *Edison Elec. Illumination Co.*, *supra*; Asia, Employment Relation: Common-Law Concept and Legislative Definition, *supra*.[11]

c. *Misclassification.* The third reported question asks "[w]hether a defendant may be liable for employee misclassification under [G. L. c. 149, § 148B (independent contractor statute),] where there was no contract for service between the plaintiff and defendant."[12] To this question, we answer, "Yes."

This certified question arises within the context of pending

---

[11]It is important to note that "instrumentality" in this context is to be understood broadly, as the particular practice of the franchisee that led to the plaintiff's injury. In *Kerl* v. *Dennis Rasmussen, Inc.*, 273 Wis. 2d 106, 135 (2004), the instrumentality of the harm was identified as the franchisee's supervision of its employees. The franchisor was held not vicariously liable, because it did not have authority to control such supervision. *Id.* Here, Depianti alleges that Bradley made certain representations as to monthly income, available volume of customer accounts, and anticipated hourly rates of pay. He also alleges that certain conduct by Bradley constituted systemic breach of its contract with Depianti. These would appear to be the "instrumentalities" at issue, and the assessment of Jan-Pro's vicarious liability would then turn on whether Jan-Pro controlled or had a right to control Bradley in connection with such representations and conduct.

[12]General Laws c. 149, § 148B, states, in relevant part:

"(*a*) For the purpose of this chapter and chapter 151, an individual

cross motions for summary judgment as to Jan-Pro's liability for employee misclassification under the independent contractor statute. In contrast to his G. L. c. 93A and misrepresentation claims against Jan-Pro, which allege vicarious liability by virtue of Bradley's conduct, here Depianti maintains that Jan-Pro is directly liable for its own violation of the independent contractor statute. In essence, Depianti claims that Jan-Pro itself misclassified Depianti as an independent contractor by designing and implementing the multi-tiered franchise structure that labels Depianti a franchisee, or independent contractor, rather than an employee, and by imposing this structure, through which it maintains control over a network of cleaning workers, upon "master franchisees" such as Bradley and "unit franchisees" such as Depianti.[13] Jan-Pro appears to have taken the position in

performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless: —

"(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

"(2) the service is performed outside the usual course of the business of the employer; and,

"(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

". . .

"(d) Whoever fails to properly classify an individual as an employee according to this section and in so doing fails to comply, in any respect, with chapter 149, or section 1, 1A, 1B, 2B, 15 or 19 of chapter 151, or chapter 62B, shall be punished and shall be subject to all of the criminal and civil remedies, including debarment, as provided in section 27C of this chapter. . . ."

[13]In this regard, Depianti alleges, inter alia, that "Jan-Pro has developed the methods, procedures, and products which it requires its [regional master franchisees] to use in selling cleaning franchises and directing the work of [unit franchisees]," that the contracts between regional master franchisees and unit franchisees are "standard form contracts that are developed and written by Jan-Pro," that "Jan-Pro janitors must conduct their cleaning services according to the procedures that Jan-Pro dictates in its training program," that "Jan-Pro retains the right to enforce provisions of [the contracts between regional master franchisees and unit franchisees] directly and may directly

the United States District Court that, as a matter of law, and irrespective of whether it can establish the indicia of an independent contractor relationship set forth in G. L. c. 149, § 148B (a), it cannot be held liable under the statute because it has no contract with Depianti.

It is within this context that we consider the limited question certified to us, which we understand as asking only whether a contract between the parties is a necessary element of a claim under G. L. c. 149, § 148B.[14] We conclude that the lack of a contract between the parties does not itself, without more, preclude liability under the independent contractor statute.

The nub of the parties' dispute as to whether a contract between them is a necessary element of a claim for misclassification under G. L. c. 149, § 148B, derives from language contained in G. L. c. 149, § 148B (a) (1). This language requires that an independent contractor be "free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact." The parties dispute the import of the reference to a putative employee's "contract for the performance of service" and, specifically, whether it contemplates, as a prerequisite for holding a putative employer liable for misclassification under the independent contractor statute, that there be a contract between the putative employer and the putative employee. Depianti argues that nothing in the language of the independent contractor statute restricts the statute's application to circumstances where the parties have entered into a contract together, and that it would counter the legislative intent to read such a restriction into the statute. Jan-Pro contends that the language of G. L. c. 149, § 148B (a) (1), indicates that the Legislature presumed a contractual relationship between the parties, and that we should therefore require

oversee the work of any [unit franchisee]," and that "Jan-Pro reserves the right to terminate any account assigned to [unit franchisees] and to cancel the entire franchise agreement."

[14]Accordingly, we neither analyze the elements necessary to maintain a claim under G. L. c. 149, § 148B, nor consider the application of the statute to franchise arrangements such as the one here. While the parties in their briefs discuss the presence or absence of record support for the three-pronged statutory indicia of an independent contractor relationship, see G. L. c. 149, § 148B (a), such matters are not before us, and we do not evaluate the adequacy of the record for summary judgment purposes.

such a relationship as a prerequisite to application of the independent contractor statute.

"Where the meaning of a statute is not plain from its language, familiar principles of statutory construction guide our interpretation." *DiFiore* v. *American Airlines, Inc.*, 454 Mass. 486, 490 (2009) (*DiFiore*). We seek to interpret the statute "according to the intent of the Legislature ascertained from all the words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975), quoting *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). "In addition, our respect for the Legislature's considered judgment dictates that we interpret the statute to be sensible, rejecting unreasonable interpretations unless the clear meaning of the language requires such an interpretation." *DiFiore, supra* at 490-491. See *Commonwealth* v. *Dodge*, 428 Mass. 860, 865 (1999), quoting *Beeler* v. *Downey*, 387 Mass. 609, 616 (1982) ("we must read the statute in a way to give it a sensible meaning").

Generally, remedial statutes such as the independent contractor statute are "entitled to liberal construction." *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985). See *Terra Nova Ins. Co.* v. *Fray-Witzer*, 449 Mass. 406, 420 (2007) (statute is remedial where it is "intended to address misdeeds suffered by individuals," rather than to punish public wrongs). Employment statutes in particular are to be liberally construed, "with some imagination of the purposes which lie behind them." *Lehigh Valley Coal Co.* v. *Yensavage*, 218 F. 547, 553 (2d Cir. 1914), cert. denied, 235 U.S. 705 (1915). See, e.g., *Boston* v. *Commonwealth Employment Relations Bd.*, 453 Mass. 389, 391 (2009).

The purpose of the independent contractor statute is "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees." *Taylor* v. *Eastern Connection Operating, Inc.*, *ante* 191, 198 (2013). We previously have recognized the importance of proper clas-

sification of employees. See *Somers* v. *Converged Access, Inc.*, 454 Mass. 582, 593 (2009) ("Misclassification not only hurts the individual employee; it also imposes significant financial burdens on the Federal government and the Commonwealth in lost tax and insurance revenues. Moreover, it gives an employer who misclassifies employees as independent contractors an unfair competitive advantage over employers who correctly classify their employees and bear the concomitant financial burden"). See also Advisory 2008/1, Attorney General's fair labor and business division (detailing deleterious effects of employee misclassification).

The independent contractor statute establishes a framework for determining whether a worker is an employee or an independent contractor. First, "an individual performing any service" is presumed to be an employee. G. L. c. 149, § 148B (*a*). Second, the statute lays out three indicia of an independent contractor relationship, all three of which must be established to rebut the presumption of employment. G. L. c. 149, § 148B (*a*) (1)-(3). The statute contains no language limiting its application to circumstances where the putative employer and the putative employee have entered into a contract together.

In light of the statute's broad remedial purpose, "it would be an error to imply . . . a limitation where the statutory language does not require it." *Psy-Ed Corp.* v. *Klein*, 459 Mass. 697, 708 (2011). See *General Elec. Co.* v. *Department of Envtl. Protection*, 429 Mass. 798, 803 (1999) (court will not read words into statute). Limiting the statute's applicability to circumstances where the parties have contracted with one another would undermine the purpose of the statute, see *Taylor* v. *Eastern Connection Operating, Inc.*, *supra*, as such limitation would permit misclassification where a putative employer, otherwise liable under the statute, is insulated from such liability by virtue of an arrangement permitting it to distance itself from its employees. Cf. *Cumpata* v. *Blue Cross Blue Shield of Mass., Inc.*, 113 F. Supp. 2d 164, 168 (D. Mass. 2000) ("The Wage Act is meant to protect employees from the dictates and whims of shrewd employers").

As stated, Jan-Pro contends that the mention of a contract in G. L. c. 149, § 148B (*a*) (1), indicates that the Legislature

intended the independent contractor statute to apply only where the parties have contracted with one another. Subsection (*a*) (1) delineates the first of the three factors that must be established to rebut the presumption of employment: "the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact." G. L. c. 149, § 148B (*a*) (1). While the use of the conjunctive "and" rather than the disjunctive "or" between the phrases "under his contract for the performance of service" and "in fact" arguably suggests that the Legislature presumed a contractual relationship between the parties, we conclude that such language "reflects nothing more than the Legislature's failure to imagine the possibility" that an entity that did not contract with the plaintiff would be the agent of misclassification. *DiFiore, supra* at 497. Such language does not reflect any legislative intent to allow an employer to insulate itself from liability for misclassification by causing or creating another entity to contract with its employees. See *id.* In light of the purpose of the independent contractor statute, see *Taylor* v. *Eastern Connection Operating, Inc., supra,* and given that remedial statutes are "entitled to liberal construction," *Batchelder* v. *Allied Stores Corp., supra,* we understand G. L. c. 149, § 148B (*a*) (1), to indicate merely that a putative employer's control and direction over a putative employee's performance is to be assessed both under the terms of the putative employee's contract for service, if any, as well as in fact.

Further, G. L. c. 149, § 148, the wage statute, declares that "[n]o person shall by a special contract with an employee *or by any other means* exempt himself" from the obligation to pay lawful wages to employees (emphasis added). See *Awuah* v. *Coverall N. Am., Inc.,* 460 Mass. 484, 492 (2011). The enactment of this provision indicates that the Legislature "was cognizant, in general, of the risk that employers or other persons may seek to find ways, through special contracts or other means, to attempt to avoid compliance . . . and intended to thwart such schemes." *DiFiore, supra.*[15]

---

[15]The wage statute, G. L. c. 149, § 148, extends protections only to employees, and not to independent contractors. Therefore, where an employer

In *DiFiore, supra,* we addressed a nearly identical provision in the context of G. L. c. 149, § 152A, the tips statute, which prohibits an employer from imposing a "service charge" on customers and not remitting such charge to its employees. G. L. c. 149, § 152A (*d*). See G. L. c. 149, § 152A (*g*) ("No employer or person shall by a special contract with an employee or by any other means exempt itself from this section"). There, we held that the defendant airline could not escape the requirements of the tips statute "by entering into a contract with a service entity . . . under which the service entity would employ the service employees, waitstaff employees, and service bartenders, and agree to pay to or share with the airline or restaurant the service charge billed to customers." *DiFiore, supra* at 494. We held that "[t]his would be precisely the type of special contract prohibited by [G. L. c. 149, § 152A (*g*),] because it would provide a means to exempt the airline or restaurant from its obligations under the [tips statute]." *Id.* "To allow such an 'end run' around the [tips statute] would contravene the express purpose of the [statute], namely to protect gratuity payments given to, or intended for, service employees . . . and would nullify § 152A (*g*) of the [tips statute], which specifically forbids this type of a maneuver 'by special contract . . . [or] any other means.' " *Id.* at 496, citing *Newton Wellesley Hosp.* v. *Magrini,* 451 Mass. 777, 784 (2008), and *Wolfe* v. *Gormally,* 440 Mass. 699, 704 (2004).

The instant case is directly analogous. Assuming without in any way suggesting that Depianti was working as an employee of Jan-Pro,[16] and not as an independent contractor, Jan-Pro's contractual arrangement with Bradley, if enforceable, would provide a means for Jan-Pro to escape its obligation, as an

___

arranges for its employees to be misclassified as independent contractors, in contravention of G. L. c. 149, § 148B, such arrangement violates the provision in G. L. c. 149, § 148, declaring that "[n]o person shall by a special contract with an employee or by any other means exempt himself" from the obligation to pay lawful wages to employees.

[16]In concluding that an entity like Jan-Pro can be liable under G. L. c. 149, § 148B, without a contract between itself and the employee, we should not be understood as suggesting that Jan-Pro is in fact liable. We take no position on the question whether the necessary predicates for liability can be established here, a matter involving determinations as to the summary judgment record that are solely within the purview of the United States District Court.

employer, to pay lawful wages under the wage statute, G. L. c. 149, § 148. To allow such an "end run" around G. L. c. 149, § 148, would contravene the express purpose of the statute and would nullify the provision therein that specifically forbids this type of arrangement "by a special contract with an employee or by any other means." G. L. c. 149, § 148. See *DeFiore, supra.* See also Advisory 2008/1, Attorney General's fair labor and business division (Attorney General "will enforce [G. L. c. 149, § 148B,] against entities that allow, request or contract with corporate entities such as [Limited Liability Corporations] or S corporations that exist for the purpose of avoiding [G. L. c. 149, § 148B]").[17]

In sum, we conclude that the lack of a contract for service

[17]To the extent that the dissent maintains that the statute has no application where the parties have neither an independent contractor nor an employment relationship, we do not disagree. Our conclusion today, in accordance with the limited scope of the question certified to us, is merely that the absence of a contract between the parties does not alone preclude liability under G. L. c. 149, § 148B.

This is borne out by the hypothetical situation that the dissent outlines. There, company A contracts with company B for services, and company B enters into arrangements with third parties to perform the work it undertook under its contract with company A. We agree that ordinarily, in such circumstances, company A would not be liable for misclassification of the third-party workers. This is because ordinarily, in such circumstances, company B would be the agent of any misclassification. However, here Depianti alleges that Jan-Pro, and not Bradley, designed and implemented the contractual framework under which he was misclassified as an independent contractor. See note 13, *supra.* The lack of a contract between Depianti and Jan-Pro does not itself preclude liability. Where a party is the agent of misclassification, it may be directly liable under G. L. c. 149, § 148B, even where it utilizes a proxy to make arrangements with its employees. Nothing we say today, then, is at odds with the law of corporate disregard.

In suggesting that there can be no liability under the statute absent some sort of "work arrangement" between the parties, the dissent's focus seems to be upon aspects of the statute other than the language giving rise to the limited question certified to us, see G. L. c. 149, § 148B (*a*) (1), which asks only if a contract between the parties is a necessary element of a claim brought under the statute. The dissent instead appears to be concerned with what it means to "perform[] any service," see G. L. c. 149, § 148B (*a*), and who has responsibility for employee classification where such service is performed. See G. L. c. 149, § 148B (*d*) ("Whoever fails to properly classify an individual as an employee according to this section . . . shall be punished . . ."). We have not been asked to address these questions and we do not do so. See note 14, *supra.*

between the putative employer and putative employee does not itself preclude liability under G. L. c. 149, § 148B.

3. *Conclusion.* For the reasons stated, we answer the first certified question, "No," and the third certified question, "Yes." We answer the second certified question, "Yes," and add that a court applying the "right to control test" to the franchisor-franchisee relationship is to focus on whether the franchisor had the right to control the particular instrumentality of the harm.

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States District Court for the District of Massachusetts, as the answers to the questions certified.

CORDY, J. (dissenting in part). I concur with the court's answers and analysis with respect to the first two certified questions. I disagree on the third certified question. It seems to me that whether a defendant may be liable for employee misclassification under G. L. c. 149, § 148B (§ 148B), depends first and foremost on whether there is a work arrangement of some type between the defendant and the person claiming misclassification. If there is a work arrangement (i.e., some form of an agreement of pay for services), our law makes it quite clear that regardless of how the parties characterize that arrangement, it will be presumed to be an employer-employee relationship unless the party receiving the services can establish the presence of the three statutory factors set out in § 148B.

In the absence of a work arrangement between the parties, be it a written or oral, implicit or explicit, contract, agreement, or understanding, § 148B simply does not apply. If corporation A contracts with corporation B to manage a facility to certain specifications, and corporation B enters into arrangements with third parties to perform the work it had undertaken under that contract, § 148B would plainly apply to the relationship between corporation B and the persons it has engaged to do the work, but not between those persons and corporation A. The only exceptions to such an obvious conclusion would arise if corporation B was set up by corporation A specifically for the purpose

of evading the independent contractor law, or if corporation A were otherwise found to be the alter ego of corporation B, such that the corporate veil between them would be properly pierced and the work arrangement entered into by corporation B thereby attributed to corporation A. The factors to be considered in whether to disregard the deeply ingrained observance of corporate form are set out in *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. 546, 555 n.19 (2000). I see no evidence of legislative intent in § 148B to change the body of law that governs the liability of such distinct entities.