Whitehead, Howard J., J.
Nature of Proceedings
Plaintiff, a real estate leasing agent, brought this action against defendant, a real estate leasing agency, under the Commonwealth’s Wage Act, G.L.c. 149, sects. 148-159C, to recover commissions which he says were owing to him from real estate rentals and were not paid in a timely manner after his discharge from the agency. The case was tried before the Court on August 22, 2013 and August 23, 2013. The following constitute the Court’s findings of fact, rulings of law and order for judgment after trial.
Findings of Fact
Plaintiff, Philip Bova (Bova), sought employment from defendant, Gateway Real Estate Group, Inc. (Gateway), in the fall of 2009. Bova, at the time, had had some experience with real estate, in that he owned and managed a three-unit apartment building in Lawrence. Gateway is owned and managed by one Craig Peper and one Paul Richards. It is in the business of securing tenants for residential property owners in the City of Boston. To that end, it employs a number of leasing agents. Most of its clients are college or graduate students.
Bova was interviewed for the position of leasing agent in November 2009. Conducting the interview on behalf of Gateway was one Jillian Chan, a member of the Gateway’s management team. During the interview, Bova was told that he would be hired once he had secured a real estate agent’s license. He was also told that his compensation would be on a commission basis only. Chan referred him to an entity known as the Lee Institute for purposes of obtaining his agent’s license. He passed the agent’s exam in December 2009.
Shortly after Bova passed the exam he was asked . by Gateway to attend an orientation for himself and several other agents. The orientation was given by Chan. At the orientation, Bova and the other agents attended a properly viewing. Bova also was handed an informational packet that included a document entitled, “Independent Contractor Agreement.” The agreement comprises Exhibit 15 in evidence. The agreement was not discussed during the orientation. Bova did not read it closely and never signed it.
Bova commenced working in early January 2010. When he appeared for work, he was given paperwork necessary for the issuance of a federal income tax Form 1099, which paperwork he signed. He was assigned a desk with a land line telephone in Gateway’s office and was given a laptop computer. Management stated that he was expected to be working at the office from 10:00 a.m. until 6:00 p.m. each day. Whether from direct communications between Bova and management, or osmosis through other agents—the record is not clear on the point—there was a mutual understanding between the parties that the duties of Bova as a leasing agent were as follows:
Actively market and advertise any/all listings available to agents of the company where a fee could be collected.
Communicate with prospective clients and show all prospective clients apartments that fit their expressed criteria.
Facilitate the proper completion of all paperwork required by both the company and the landlord necessary to secure the complete rental deal, including but not limited to a broker fee disclosure, schedule of fees, applications, co-signer forms (if necessary), credit checks and leases.
Collect all monies from clients and landlords in connection with rental deposits.
Provide the landlord with all paperwork and deposits required as well as be the point of contact for both the landlord and the client throughout the entire time line of the transaction so as to provide all services required to ensure a smooth transaction. Typical additional duties included, but were not limited to, getting extra documents, re-showing the apartment to a group or its members’ parents, talking to parents, dropping off paperwork, measuring the apartment, making key copies, undertaking key exchanges, fielding questions from clients and-or parents, making and providing move-in packets.
Facilitate a smooth move-in experience for the clients as well as provide any/all after-move-in customer service necessary from either the landlord or client.
Attend weekly office sales meetings.
Obtain new and updated rental listings.
Act and conduct oneself in a professional manner when dealing with clients as well as co-workers.
The parties also mutually understood that the agent’s commission would consist of between 50% and 60% of Gateway’s commission on each transaction, the exact percentage being determined according to a schedule posted by Gateway. (In practice Gateway paid the higher percentage on rentals that involved apartments in the area of Northeastern University, as it was trying to break into that market.)
None of the above facts is really in dispute. What is in dispute is the timing of the payment of the agent’s commission and the amount of a charge back in the event that, like Bova, an agent was to leave his/her employment before a tenancy commenced. It does not appear that the parties ever discussed the matter verbally during the period of Bova’s actual employment. However, the written “Independent Contractor *392 Agreement” that was tendered to Bova during his orientation does address the matter. Paragraph 6(a) of the agreement provides that, during his period of employment, Gateway will pay the agent his/her commission “as soon as practicable” after Gateway had collected its commission. By virtue of Paragraph 18, an agent whose employment has terminated is entitled to a commission on any contract executed with the client before his termination, so long as the deal ultimately goes through. The one qualification to that rule is stated in Paragraph 19, which provides as follows:
In the event [agent’s] engagement with the [Gateway] is terminated by either [agent] or [Gateway], prior to completion of any deal the [agent] may be working on, the commission due and payable at the completion of the deal to the [agent] shall be adjusted downward as follows:
A. [Agent] shall be paid 40% of the commission that THEY would have earned (Commission paid after split, NOT Total Gross commission for the deal) had [agent] completed the deal.
B. 40% of the original commission shall be paid to the individual(s) who takes over and completes the deal.
C. 20% of the original commission shall be paid to [Gateway].
“Completion of the deal” shall be defined as either the date when the tenant(s) move in, or when all monies are collected, whichever is LATER.
In all cases, in the event of [agent’s] termination, no commission shall be due, payable, or paid whatsoever until 1) all [Gateway] paperwork is complete; AND 2) all sums due on the transaction have been paid to [Gateway], AND NO COMMISSION shall be due or payable prior to the September 1st date following the termination, and will be in full compliance with this paragraph.
In addition, Paragraph 8 permits Gateway to deduct from commissions any expenses or monies advanced to the agent; Paragraph 23B permits Gateway to deduct any losses sustained by Gateway as a result of incomplete and/or improper submission of paperwork by the agent; and Paragraph 23C permits it to deduct any amounts due from a tenant should a tenant move in prior to payment of all monies owed.
So far as the record appears, Gateway, in practice, compensated its employees, including Bova, in the manner set forth in the agreement. That is to say, it paid out to its agents who were actively employed, their share of commissions earned by the company as soon as those commissions had been received by the company, all paperwork had been completed and all fees had been collected, subject to the charge backs referenced in Paragraphs 8, 19 and 23.
Bova worked for Gateway for a year and one-half and was compensated consistent with company practice. At no time during that period did he work for any other company. In late May or early June 2011, he was involved in an incident which deprived him of transportation necessary for him to fulfill his duties with Gateway, and his employment was terminated by the company. On or about June 10, 2011, Gateway’s co-owner, Paul Richards, met with Bova for the purpose of reviewing the status of each of his unfinished deals. Bova came to the meeting with the understanding that there would be an adjustment to the commissions due him given the unfinished status of the deals.
In all, there were 16 deals that were not “finished,” in that the tenants had not yet moved in. The addresses to which those deals related consisted of the following: 43 Hemenway Street, Unit 1; 719 Parker Street, Unit 2; 60 Charlesgate East, Unit 115; 23 Cortez Street, Unit 7; 17 Hillside Street, Unit 1; 11 Burney Street, Unit 1; 9 Wigglesworth Street; 1607 Tremont Street, Unit 2; 5 Darling Street, Unit 2; 41 Anderson Street, Unit B; 86 Linden Street, Unit 1; 85 Brainerd Street, Unit TH6; 448 Park Drive, Unit 4; 62 Pontiac Street; 47 Gardner Street, Unit 5; 41 Egremont Street, Unit 1. With respect to the first nine of the listed addresses, the parties agree that all paperwork had been completed and all fees had been collected, with the exception of a $40.00 application fee for Park Drive, an $80.00 application fee for Pontiac Street, and a $100.00 application fee for Linden Street. Despite the overdue fees, Gateway had already paid Bova his full commission on those deals. Those payments totaled: $13,568.00.[1]
There is a dispute as to how many of the remaining deals required additional paperwork or fees. Co-owner Craig Peper, on behalf of Gateway, testified that there were still fees to be collected with respect to 41 Anderson and 41 Egremont. Bova testified that all paperwork and fees had been completed on those properties but conceded that paperwork still needed to be completed with respect to 85 Brainerd, and a security deposit was still due with respect to 47 Gardner. The Court determines that both witnesses were making their best efforts to be truthful. However, it concludes that Bova’s testimony was probably more accurate, since he was the person most directly involved with the properties. In either circumstance, it is likely that Gateway had already received a check for its commission on the properties. The total value of the commissions on the 7 properties was $11,704.00.
By the terms of Paragraph 19 of the Independent Contractor Agreement, none of the 16 deals had been “completed” within the meaning of the agreement as of the time that Bova was terminated. Thus, Bova was only entitled to 40% of the commissions that he ordinarily would have received on the deals. To the extent that he had already been paid his full commissions on a property, he was subject to a charge back against those commissions. The charge back would have amounted to $8,140.80. Moreover, by the express terms of Paragraph 19, he was not entitled to any *393 portion of his commissions on the remaining properties until September 1, 2011. Thus, Gateway owed Bova no money as of his termination date. Bova actually owed Gateway money, namely the $8,140.80. As of September 1, additional commissions would have accrued, but the calculation would still result in a net negative for Bova. The calculation would have been as follows:
Overpayment to Bova on first 9 deals: -$8,140.80 (60% of $13,568.00)
Amount due to Bova on last 7 deals: +$4.681.60 (40% of $ 11,704.00)
Balance owed by Bova: -$3,459.20[2]
Although Bova had never signed the Independent Contractor Agreement, Gateway took the position that the framework set forth therein governed the calculation of Bova’s commissions. Thus, in late June 2011, it informed him that it owed him no money. Nevertheless, it offered to follow a more generous method of calculating the commissions, one that gave Bova a greater share of his original entitlement, and stated that it would send him a check for $3,818.30 after September 1 had arrived and all of the move-ins had taken place.[3] In fact, on September 19,2011, Gateway sent Bova an even larger check, in the amount of $6,766.60. Bova declined the payment and contended that he was entitled to more.
Bova’s position has been that he was entitled to commissions on the last seven properties as of the time that he was terminated. Although he concedes that some reduction of the full commission is appropriate on some of the deals because there was some work to be done on some of the deals prior to and at the time of move-in, he contends that with respect to most of the properties, the landlord would assume responsi-bilfiy for the remaining work, and that, therefore, the formula set forth in the Independent Contractor Agreement for calculating deductions from his commissions—a formula that he never agreed to in writing in the first place and that therefore is not binding on him—is unfair. However, he does not advance a specific alternate formula.
Gateway takes the position that the formula and timing set forth in the agreement for calculating and paying commissions are the ones that govern. As to the fairness of the agreement, it points of that a certain number of deals “blow up” between the time that a lease is signed and the time that the tenants move in. Other issues arise that affect the total commission that Gateway ultimately receives. Moreover, it asserts, an agent’s work on a deal is far from done even after all of the paperwork and fees have been collected. For example, it states, in many cases, either the landlord or the tenant seeks changes in the terms of the lease after execution. A tenant may wish to re-visit the apartment in order to take measurements. Prospective tenants sometimes seek assistance in purchasing furniture from the tenants who are moving out. Furthermore, the move-in process in Boston is a week-long event during which the agent must run from apartment to apartment delivering keys and move-in packets, and ensuring that units are move-in ready. While it may be that, in some cases, the landlord’s property manager will assume primary responsibility for move-in, the Court accepts the testimony of Peper that, in the end, it is Gateway upon whom the responsibility falls if issues arise. Thus, a successor agent must always pick up the deal, and the scope of his work is unknown until move-in actually has occurred.[4]
Rulings of Law and Discussion
Bova claims that Gateway has violated the Wage Act, specifically, G.L.c. 149, sect. 148. The relevant language of section 148 is as follows:
. . . [EJveiy . . . employee discharged from . . . from employment shall be paid in full on the day of his discharge . . .
[[Image here]]
This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been finally determined and has become due and payable to such employee . . .
General Laws c. 149, sect. 150 provides that no suit may be brought for a violation of section 148 unless a complaint has first been filed with the Attorney General, and unless either the Attorney General has given the plaintiff permission to bring suit or ninety days have passed from the filing of the complaint. Gateway asserts that Bova has neither pleaded nor proven compliance with section 150 and, thus, is barred from bringing this action. However, the Court is of the view that it was Gateway that had the burden at least to raise the issue. Since it did not do so, it has waived its objection, and the suit stands unless the filing requirement is jurisdictional in nature. Depianti v. Jan-Pro Franchising International, Inc., 465 Mass. 607, 611 (2013). In Depianti, the Supreme Judicial Court held that a failure to comply with the filing requirement of section 150 is generally not jurisdictional. That is because the purpose of the requirement is primarily an informational one and not an integral part of the remedial scheme of the Wage Act. Id. at 612-14. The Court observed that the informational purpose of the statute had not been frustrated in that case because notice ultimately was given after suit was filed, and the defendant had shown no prejudice from the absence of notice. Id. In the present case, there was no competent evidence as to whether notice had been provided to the Attorney General. Bova’s counsel represented that notice had been given and offered a letter from the Attorney General that approved the filing of a Wage Act claim by Bova, but the nature of the claim was not detailed in the letter. It appears that Bova’s counsel was caught somewhat “flat-footed” by the eleventh-hour timing of Gateway’s objection to the *394 suit. In the circumstances, the Court is of the view that the burden should be on Gateway to demonstrate that the statute was, in fact, frustrated or that Gateway has suffered prejudice. It has not met that burden. Hence, Bova’s suit properly stands.
Gateway has made a passing assertion that Bova was not an “employee” within the meaning of section 148. The term is actually defined in section 148B. The Court need not discuss in detail that definition, as it is apparent on the face of the statute that, notwithstanding the fact that Bova was handed an “Independent Contractor Agreement” at orientation, Bova met the definition of employee for purposes of the Wage Act.
The real issue in this case is whether there were commissions which, “less allowable or authorized deductions, [had] been definitely determined and [had] become due and payable” to Bova at the time of his discharge. A resolution of that issue turns on the extent to which the method for determining the timing and amount of commissions that is set forth in the Independent Contractor Agreement governs Bova’s situation, since, as the Court has already pointed out, if the method set forth in the agreement does govern, Bova was entitled to nothing, either at the time of his discharge or later.[5]
It is true that Bova did not sign the written agreement. However, implicit in his joining the company was an agreement to be governed by the standard policies of the company, including its policies regarding compensation. Those policies would have been established by any writings that were handed to Bova during his employment, as well as what the company actually did in practice during his period of employment. Here, the relevant writing is the Independent Contractor Agreement. In the view of the Court, the fact that Bova did not sign the agreement does not compel the conclusion that he did not concur with its content. In fact, the circumstance that he worked for the company for a year and a half after receiving it warrants the conclusion that he did concur. Compare generally O’Brien v. New England Telephone and Telegraph Co., 422 Mass. 686, 691-92 (1996) (Personnel manual provided to employee may be deemed implicitly adopted as contract by employer and employee). Moreover nothing in Gateway’s practice contradicted the agreement. Id. at 692 (Employer’s adherence to procedures set forth in manual is some evidence that terms of manual were part of employment contract). Bova points out that agents actively in the employment of the company were given their commissions once all of the paperwork had been completed and fees had been collected. But, as the Court has already observed, such an arrangement, in fact, was provided for in Paragraph 6(a) of the agreement, subject to charge backs as provided in Paragraphs 8,23B and 23C.[6] The situation was different with respect to an agent who had been terminated. Once an agent was terminated, his right to immediate payment of commissions ceased by virtue of Paragraph 19, and he had to wait until after move-in in order to receive what at that point was a reduced commission. There is no evidence that Gateway failed to follow that policy with respect to any agent.
Bova contends that the 60% reduction in his commission for deals where move-in had not taken place by the time of his termination is arbitraiy and unfair. While the reduction is significant, the Court cannot say that it is either arbitraiy or unfair. The potential for additional time-consuming work on the part of the agent existed well after the paperwork was complete. Gateway had the right to protect itself against expenses associated with that work, including any expenses incurred to review the progress of the deal as it stood at the time of the original agent’s departure and expenses required to incentivize a successor agent to complete a deal that he/she did not originate. Cf. TAL Financial Corporation v. CSC Consulting, Inc., 446 Mass. 422, 431 (2006) (outlining general criteria for determining reasonableness of liquidated damages clause in equipment lease). While it may have turned out that at least some of Bova’s unfinished deals did not require as much work on the part of Gateway and Bova’s successor as others, the reasonableness of the reduction should be determined in light of what the parties knew when the agreement was formed. Cf. Kelly v. Marx, 428 Mass. 877, 880 (1999) (determining reasonableness of liquidated damages clause in contract to purchase real estate). Furthermore, by any test of reasonableness, the Court concludes that Gateway’s actual tender of $6,677.60 in September 2011, satisfies the test.
Lastly, Bova contends that the charge backs against Bova’s commissions on the last seven deals constitute the kind of set off that is proscribed by the holding in Camara v. Attorney General, 458 Mass. 756, 762-64 (2011). The Court disagrees. Unlike the circumstances surrounding the set-offs in Camara, here, both the trigger and the formula for calculating the charge backs is clearly articulated in the agreement between the parties. Bova’s debt to Gateway as a result of his termination was “clear and established.” Somers v. Converged Access, Inc., 454 Mass. 582, 593 (2009). Its calculation was simply a matter of arithmetic.
Order
Thus, the Court finds no Wage Act violation on the part of Gateway and orders that judgment enter for the defendant.

A minor undisputed offset had been taken against the commission on one of the properties as the result of Bova’s earlier failure to collect fees in connection with another property.

Nhe Court has not factored in additional deductions from Bova’s commissions which Gateway claims for the cost of his laptop computer, which he still retains, and the expense of a dishwasher which Gateway claims it had to pay to a landlord *395 as the result of a misrepresentation by Bova to the prospective tenants.

Gateway’s method for arriving at the $3,818.30 figure is set forth in Exhibit 13 in evidence.

As noted, in arriving at the 60% figure for the reduction of the departing agent’s commission, Gateway assigns 40% to pay the successor agent and 20% to compensate Gateway for its risk and any other work it must perform.

The Court should note that in doing its calculations the Court combined Bova’s commissions for the individual deals into two groups, one involving the deals for which he had already received checks, and the other involving deals for which he had not received checks. Bova had asked the Court to consider each deal individually. However, doing so would not affect the outcome in this case. By any measure, under the terms of the agreement, at the time of Bova’s discharge, money was owed by Bova to Gateway on each of the deals on which he had already received a check, and no money was owed to Bova by Gateway on any of the remaining deals until after move-in had occurred.

In fact, Bova himself had been subject to an unrelated charge back before his termination.