Curran, Dennis J., J.
Yogendra Sagar alleges that he, along with a class of all taxi drivers who serviced customers identified through the dispatch service Cambridge Radio Dispatch, Inc., have been wrongly classified since October 2009 as independent contractors when in fact they were employees.[1] He claims that this misclassification resulted in failure to pay minimum wages to the putative class in violation of G.L.c. 151, §§1, 7, failure to pay overtime to the putative class in violation of G.L.c. 151, §1A, and illegal deductions from the putative class’s wages in violation of G.L.c. 149, §148. He also brings a claim for unjust enrichment based on essentially the same allegations. Mr. Sagar brings these claims on behalf of himself and the putative class against Ambassador and its owner, George Fiorenza.
The parties have submitted cross motions for summary judgment. For the reasons that follow, Mr. Sagar’s motion for summary judgment will be DENIED, and the defendants’ motion for summary judgment will be ALLOWED in part and DENIED in part.
BACKGROUND
The following facts are taken from the summary judgment record; unless otherwise noted, such facts are undisputed.
A. The Structure of the Taxi Industry in Cambridge
The city of Cambridge has issued 257 taxi medallions that permit the lawful operation of a taxi cab. The medallions are typically owned by corporations created for the purpose of holding title to them, and leased to other persons interested in operating taxis in Cambridge. These leaseholders may drive taxis themselves, and may also sub-lease the medallions to other drivers. The process of sub-leasing the medallions is termed “shifting out” the medallions, because the sub-leases are relatively short in duration, sometimes amounting to weekly “shifts.”
Leaseholders make lease payments to the medallion corporations. Sub-lessees make “shift payments” to the leaseholders. Medallion owners generally have no operational control over the actions of leaseholders, and leaseholders have no operational control over the actions of sub-lessees. There is no evidence that sub-lessees make shift payments to cab dispatch companies such as Ambassador.
B. The Parties
Ambassador is a Massachusetts corporation owned by Mr. Fiorenza. Ambassador contends, and Mr. Sagar denies, that it is engaged in the business of providing taxi cab dispatch services to approximately 120 taxis operating in Cambridge.[2] Mr. Sagar contends, and Ambassador denies, that it is engaged in the business of providing taxi services to the public.[3]
Ambassador offers its dispatch services to medallion owners and leaseholders. Ambassador installs a GPS device, a radio, and a credit card reader in all taxis *590 that use its services. The GPS device directs drivers to the locations of passengers requesting taxi services. Ambassador charges subscription fees to the medallion owners or leaseholders for the use of its dispatch services. Those subscription fees are not paid by the drivers of the taxis like Mr. Sagar. Ambassador also charges a 10% processing fee for all corporate vouchers, credit card receipts, or coupons redeemed using its equipment or accounts. The processing fees are deducted from the payments made to taxi drivers, when redeemed through Ambassador.
Although not extensively developed in the summary judgment record or the parties’ briefs, there is some evidence that Ambassador maintains corporate customers who purchase taxi services directly from Ambassador. Ambassador issues corporate vouchers to those customers, who then call Ambassador to obtain taxi service, which then dispatches a taxi using its dispatch service. There is no evidence about how much of Ambassador’s business activities are devoted to providing service to corporate customers.[4]
Mr. Fiorenza owns and manages Ambassador, and likewise owns seventeen medallion corporations. Mr. Fiorenza’s medallion corporations lease the medallions to leaseholders on a year-to-year basis according to rates regulated by the city of Cambridge.
Mr. Sagar obtained his hackney license from Cambridge in September 2010. After being licensed, he worked for Checker Cab Company in December 2010, and drove a taxi using Ambassador’s dispatch services starting in January 2011. From January 2011 until January 2013, Mr. Sagar obtained work by filling in, on a temporary basis, for drivers that lease or sublease medallions from medallion corporations. After January 2013, he “made regular arrangements to drive the same cab,” suggesting he may have become a primary leaseholder of a medallion. Some, but not all, of Mr. Sagar’s temporary work involved driving taxis using Ambassador’s dispatch service.
C. The Relationships Between the Parties
Taxis using Ambassador’s dispatch service must be painted according to a uniform color scheme. Ambassador’s “dispatch service agreement” requires that drivers of taxis using its dispatch service maintain the interior and exterior appearance of their vehicles, and honor certain forms of payment, including the corporate vouchers issued to customers of Ambassador.
However, Ambassador, Mr. Fiorenza, and the medallion corporations exercise no control over the shifting out of the medallions.[5] They also exercise no control over the manner in which the taxis are driven. They assign neither a particular place, time, nor shift for taxi drivers to work.[6] Taxi drivers may work under one or more leaseholders of medallions at a time, whether or not they use Ambassador’s dispatch services.
Taxi drivers using Ambassador’s services are not required to agree to pick up passengers identified through its GPS device.[7] Taxi drivers using Ambassador’s services remain free to pick up passengers through other means, such as people waiting at taxi stands or who hail them from the street, who were not identified using its GPS device.
Taxi drivers operating taxis that use Ambassador’s dispatch service retain all cash fares and tips received from passengers, but pay the 10% processing fee to Ambassador when redeeming corporate vouchers, credit card receipts, or its coupons.
DISCUSSION
The familiar standard governing motions for summary judgment provides that summary judgment shall be granted forthwith where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’rofCorr., 390 Mass. 419, 423 (1983). In assessing the record on a motion for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. Terra Nova v. Fray-Witzer, 449 Mass. 406, 411 (2007). However, “(mjere allegations or conclusory assertions are insufficient to avoid summary judgment.” Schwartz v. Travelers Indem. Co., 50 Mass.App.Ct. 672, 676 n.6 (2011).
Both motions for summary judgment turn on the question of whether or not the putative class was misclassified as independent contractors. That issue is governed by G.L.c. 149, §148B, which provides that “an individual providing any service . . . shall be considered an employee” if they fit certain criteria provided in the statute.
‘The employer bears the burden of proof, and, because the conditions are conjunctive, its failure to demonstrate any one of the conditions . . . suffices to establish that the services in question constitute ‘employment’ within the meaning of [§148B].” Schwann v. FedEx Growid Package Sys., Inc., No. 11-11094, 2013 WL 3353776, at *1 (Stearns, J.) (D.Mass. Jul. 3, 2013), citing Athol Daily News v. Bd. ofDiv. of Empl. & Training, 439 Mass. 171, 175 (2003).
After reviewing the summary judgment record, this Court concludes, first, that Mr. Sagar performed services on behalf of the defendants. As a threshold matter, G.L.c. 149, §148B applies. Second, applying the statute to Mr. Sagar, this Court concludes that a dispute of material fact precludes summary judgment in favor of either Mr. Sagar or the defendants.
A. Mr. Sagar’s Service for the Defendants
General Laws chapter 149, section 148B applies to “an individual performing any service.” (Emphasis added.) “In the absence of a work arrangement between the parties, be it a written or oral, implicit or explicit, contract, agreement, or understanding, §148B simply does not apply.” Depianti v. Jan-Pro Franchising, Inc., 465 Mass. 607, 624 n. 17, 625 *591 (2013). Although Ambassador vigorously argues otherwise, this Court concludes that §148B applies here.
As an initial matter, this Court is mindful that a direct contractual relationship is not required for section 148B to apply. “Limiting [§148B’s] applicability to circumstances where the parties have contracted [directly] with one another . . . would permit misclassifi-cation where a putative employer, otherwise liable under [§148B], is insulated from such liability by virtue of an arrangement permitting it to distance itself from its employees.” Depianti, 465 Mass. at 621.[8] For this reason, the lack of a direct contractual relationship between Ambassador and Mr. Sagar does not preclude the application of section 148B.
Ambassador relies heavily on the structure of the taxi industry in Cambridge, which includes medallion owners, leaseholders, and sub-lessees, to argue that Mr. Sagar provided his taxi driving services on behalf of medallion leaseholders and sub-lessees, rather than Ambassador. Ambassador suggests that, because its business relationships are with medallion owners and leaseholders, rather than sub-lessees like Mr. Sagar, there is no basis on which to conclude that Mr. Sagar did any work, or performed any service, on behalf of Ambassador.[9] There is some force to this argument.
The customers of Ambassador’s dispatch services are medallion owners and leaseholders, who pay subscription fees to Ambassador. This relationship does not involve Mr. Sagar or his work as a taxi driver. Consequently, Ambassador’s dispatch services, provided to medallion owners and leaseholders, did not involve any service performed by Mr. Sagar for Ambassador. [10]
However, the parties agree that Ambassador also contracted directly with corporate customers to provide taxi services. Those services were delivered through drivers operating taxis using Ambassador’s dispatch service, such as Mr. Sagar. While the customers for Ambassador’s dispatch services are limited to medallion owners and leaseholders, the customers for its taxi services include passengers who obtained those services from drivers such as Mr. Sagar, on behalf of Ambassador.
For this reason, this Court concludes that Mr. Sagar did perform services on behalf of Ambassador, and section 148B applies to him.
B. Mr. Sagar’s Status as an Employee
[A]n individual providing any service . . . shall be considered an employee . . . unless (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.
G.L.c. 149, §148B.
Unless a putative employer can satisfy all three prongs of the statute, its workers will be considered employees. After review, this Court concludes Ambassador has satisfied prongs one and three of section 148B, but that there is a dispute of material fact as to whether it has satisfied prong two.
1. Direction and Control
Mr. Sagar emphasizes that Ambassador’s dispatch services agreement requires that taxis using its services be painted and maintained according to Ambassador’s specifications, and that drivers of those taxis accept certain forms of payment. These contractual requirements do not show that Ambassador had a “right to control the details of the performance” or that Mr. Sagar did not enjoy “freedom from supervision.” Martins v. 3PD, Inc., No. 11-11313, 2013 WL 1320454, at *17 (D.Mass., Mar. 28, 2013). See also id., quoting Athol Daily News v. Bd.. of Review of the Div. of Empl. & Training, 439 Mass. 171 (2003) (Section 148B is “not so narrow as to require that a worker be entirely free from direction and control”).
While Mr. Sagar alleges that Ambassador had the right to discipline or fire taxi drivers, the summary judgment record does not support that position. Ms. Lint did not testify that Ambassador has such authority, and even if she did, her opinion is not evidence that Ambassador in fact had that authority. In addition, Ambassador’s right to withdraw its dispatch services from taxis not following the conditions set forth in the dispatch services agreement does not give it the authority to discipline or fire drivers. Even if Ambassador asked a taxi to discontinue use of its dispatch service because it failed to comply with its terms and conditions of service that does not serve to prevent the driver from operating a taxi.
To further illustrate, the Massachusetts Department of Transportation likewise provides electronic toll payment services to taxi drivers (among others), subject to certain terms and conditions. See Mass Dep’t of Transportation, E-Z Pass MA Terms & Conditions, (http://www.massdot.state.ma.us/high-way /TrafficTravelResources/EZPassMAProgram/Te rmsConditions.aspx; last visited Dec. 24, 2013). The failure to observe these terms and conditions may lead the Department to withdraw its services. Id. The Department’s prerogative to terminate its service if its terms and conditions are not followed does not mean that it exercises “direction and control” over the drivers using its service. So too, with Ambassador’s dispatch service.
More to the point, Ambassador did not set Mr. Sagar’s work shifts. It did not assign him to a particular region or territory. It did not require Mr. Sagar to pick up passengers that had requested a taxi using *592 Ambassador’s dispatch services, or forbid him from picking up passengers requesting taxi service through other means, such as people waiting at taxi stands or hailing from the sidewalk. Contrast Rainbow Dev., LLC v. Dep’t of Indus. Accidents, No. 05-0435, 2005 WL 3543770, at *3 (Cratsley, J.) (Mass:Super.Ct., Nov. 17, 2005) [20 Mass. L. Rptr. 277] (putative employer “would monitor the job performance of the workers. If a worker was not performing adequate(ly) . . . [the putative employer] would have to find someone else to perform the work, essentially terminating that worker”). It did not require that Mr. Sagar operate his taxi in any specified manner, subject to its supervision.
In sum, once Mr. Sagar received information from Ambassador as to a customer’s location, he was “entirely free from its supervision in performing the services in which [he was] engaged.” Athol Daily News, 439 Mass, at 178. There is no evidence that Ambassador controlled the details of the performance of Mr. Sagar’s job, but rather, substantial evidence exists that he was free from Ambassador’s direction and control in performing his duties.
2. Usual Course of Ambassador’s Business
To satisfy the second prong, Ambassador must show that Mr. Sagar performed services “that are part of an independent, separate, and distinct business from that of [Ambassador].” Awuah v. Coverall N. Am., Inc., 707 F.Sup.2d 80, 82 (D.Mass. 2010), citing Am. Zurich Ins. Co. v. Dep’t of Indus. Accidents, No. OS-3469, 2006 WL 2205085, at *4 ((Troy, J.) Mass.Super.Ct., Jun. 1, 2006) [21 Mass. L. Rptr. 224]. Ambassador asserts that it is in the business of providing dispatch services, separate and distinct from Mr. Sagar’s taxi driving service. Mr. Sagar argues that Ambassador’s characterization of its business as “dispatch services” is merely a ruse to distance itself from its drivers. He suggests that Ambassador’s true business is taxi services, and that his work took place in the usual course of that business.
The summary judgment record supports the view that Ambassador was in fact involved in two forms of business, (1) that of providing dispatch services to medallion owners and leaseholders in exchange for a subscription fee, and (2) that of selling taxi services to corporate customers who purchased vouchers, and drivers like Mr. Sagar who provided those services.
a.Dispatch Services
Mr. Sagar did not provide his services in the usual course of Ambassador’s business, to the extent that the usual course of Ambassador’s business was providing dispatch services to medallion owners and leaseholders. In cases where a putative employer has failed to satisfy prong two, it contracted directly with customers to provide services, which it then relied on its workers to furnish to customers. See, e.g., Martins, 2013 WL 1320454 at *13 (Woodlock, J.) (defendant “contracted directly with customers to provide its services”); De Giovanni v. Jani-King, No. 07-10066, Hrg. Tr. 99:2-5 (D.Mass., Jun. 6, 2012) (defendant held “itself out as a leader in commercial cleaning and contracted] directly with its customers to provide commercial cleaning services”); Rainbow Dev., LLC, 2005 WL 3543770, at *3 (defendant “provide[d] its customers with the service that [its] employees per-formfed]”).
Insofar as Ambassador’s usual course of business was providing dispatch services, it contracted directly with medallion owners and leaseholders to provide that service, but did not rely on Mr. Sagar to furnish it. Mr. Sagar’s work as a taxi driver was not necessary to Ambassador’s dispatch services, but merely incidental.[11] For this reason, Mr. Sagar did not provide taxi driving services in the usual course of Ambassador’s business, to the extent the usual course of its business was providing dispatch services.
b.Taxi Services
There is further evidence that Ambassador was also engaged in the business of providing taxi services. First, Ambassador represents itself to the public as a “cab service” on its website. That manner of representation is relevant to the question of a section 148B defendant’s business. Martins, 2013 WL 1320454, at *14. Second, Ambassador admits that certain corporate customers maintained accounts with it, and that it would dispatch taxis to pick up passengers in need of taxi services who wanted to use those corporate accounts.
Insofar as Ambassador’s usual course of business is providing taxi services, it contracts directly with customers and then relies on drivers, such as Mr. Sagar, to provide the contracted-for services. Compare Martins, 2013 WL 1320454 at *13 (Woodlock, J.); Rainbow Dev., LLC, 2005 WL 3543770, at *3. Mr. Sagar’s services are indispensable—not merely incidental—to this aspect of Ambassador’s business. Martins, 2013 WL 1320454, at *14. Without his services, Ambassador could not offer taxi services to corporate customers. See id.
c.Dispute of Material Fact
Prong two requires that Ambassador show that Mr. Sagar did not perform his services in the “usual” course of Ambassador’s business. G.L.c. 149, §148B. As with all statutes, this Court must construe section 148B in a manner that gives effect to all of its terms, such that none are rendered mere surplusage, see Reiter Oldsmobile, Inc. v. Gen. Motors Corp., 378 Mass. 707, 711 (1979), and must interpret the wording of the statute in its usual and ordinary sense. Indus. Fin. Corp. v. State Tax Comm’n, 367 Mass. 360, 364 (1975). The key term in applying prong two here is “usual.”
*593 The definition of the word “usual” is “done, found, or used most of the time or in most cases: normal or regular.” Merriam-Webster Dictionary (2013), available at http://www.merriam-webster.com/dictio~ nary/usual (last visited Dec. 30, 2013). For this reason, what matters when applying prong two to this litigation is not whether Ambassador provides taxi services to corporate customers; the summaiy judgment record indicates that it does. What matters is whether Ambassador provides those services most of the time, or at least regularly, in the course of its business. This Court concludes that there remains a dispute of material fact as to whether Ambassador provides taxi services in the usual course of its business.
There is nothing in the summaiy judgment record to demonstrate that Ambassador provided taxi services during most of its business operations, or even that it did so regularly. There is no evidence of how frequently Ambassador provided taxi services to its corporate customers, or what proportion of its business activities was comprised of providing such services.
Ambassador’s representation of itself as a “cab company,” is not sufficient to establish, as a matter of law, that its usual business was providing taxi services. If, for example, Ambassador represented itself as an investment advisor, a military contractor, or an aerospace engineering company, saying so would not make it so. More importantly, if Ambassador’s statement that it was in the business of providing taxi services established that fact as a matter of law, then the contrapositive must also hold true, and a putative employer could rely on its own chosen description of its business to the public to establish as a matter of law that it was engaged in a business different from that of its workers to evade a misclassification claim.
Ambassador’s view of section 148B would seem inconsistent with the duty of a reviewing court to examine “the service provided,” and not the label affixed to it by the worker or the putative employer. See Martins, 2013 WL 1320454 at *13. This Court has not found any case in which a putative employer’s representation of the nature of its business was, in and of itself, sufficient to establish that employer’s usual course of business as a matter of law.
Finally, this Court emphasizes that where defendants have been found to be in the same business as their workers, courts have found that “(w]ithout the services of the workers, [the putative employer] would cease to operate.” Martins, 2013 AML 1320454, at *14, quoting Rainbow Dev., 2005 WL 3543770, at *3. Given that Ambassador is involved in providing dispatch services, which do not involve Mr. Sagar, this Court cannot conclude, as a matter of law, that without Mr. Sagar and other taxi drivers, Ambassador would entirely cease to operate. See also note 11, supra. It could fall back on its dispatch services to continue doing business with medallion owners and leaseholders.
3. Independently Established Trade, Occupation, or Business
This issue is more expeditiously resolved. Mr. Sagar asserts that he and other taxi drivers are “at the mercy” of Ambassador because it has the power to prevent them from working for any medallion owner or leaseholder by disciplining or firing them. As an initial matter, for the reasons given above, there is no evidence in the summaiy judgment record that Ambassador has the power to discipline or fire any taxi driver.
Additionally, there is no dispute that Mr. Sagar retained the prerogative to pick up passengers not identified with Ambassador’s dispatch service, such as those waiting at taxi stands or who hailed him from the sidewalk. In short, Mr. Sagar had the right to offer his services to “anyone wishing to [so] avail themselves.” See Atiy. Gen. Advisory Op. 2008/1, quoting Coverall v. Div. of Unemployment Assistance, 447 Mass. 852, 857-58 (2006).
C. Unjust Enrichment
“Massachusetts courts have repeatedly held that when there is an adequate remedy at law, there can be no unjust enrichment.” Mass. Eye & Ear Infirmary v. QLTPhototherapeuti.es, Inc., 495 F.Sup.2d 188, 192 (D.Mass. 2007); Santagate v. Tower, 64 Mass.App.Ct. 324, 329 (2005). Because Mr. Sagar and the putative class have access to the various wage and hour statutes at issue in this litigation for a remedy, an action for unjust enrichment would be duplicative.
ORDER
For these reasons, Mr. Sagar’s motion for summaiy judgment is DENIED. The defendants’ motion for summary judgment is ALLOWED to the extent it pertains to Mr. Sagar’s claim for unjust enrichment, but is in all other respects DENIED.
A decision on Mr. Sagar’s motion for class certification follows in a separate memorandum filed concomitantly.

Cambridge Radio Dispatch, Inc., doing business as Ambassador Brattle Cab, will be referred to as “Ambassador.”

Of these taxis, seventeen operated under medallions owned by corporations which are owned by Mr. Fiorenza. The record shows that remainder are owned and operated independently of Ambassador and Mr. Fiorenza.

Nhe record shows that Ambassador’s website identifies it as the “largest provider of cab service in Cambridge,” providing “accessible transportation services to those who need it most.”

Mr. Fiorenza testified at deposition that he speaks with coiporate customers on a “day-to-day” basis. However, particularly when construing all reasonable inferences in favor of the defendants in resolving Mr. Sagar’s motion for summary judgment, this evidence does not require the conclusion that, as a matter of law, Ambassador’s business involves providing *594 taxi service to corporate customers on a daily basis. Simply because Mr. Fiorenza regularly spent time communicating with Ambassador’s corporate customers does not translate that Ambassador actually provided taxi services to those customers on a regular basis. In addition, there is no evidence that Mr. Fiorenza’s work accounts for a significant proportion of Ambassador’s overall business activity.

Elizabeth Lint, executive director of the Cambridge Licensing Commission, has testified that the Commission expects dispatch services to ensure that taxi drivers follow Cambridge’s rules and regulations, but elaborated that the Commission has no way to ensure that dispatch services actually do so. In addition, Ms. Lint “suggest[ed]” that Mr. Fiorenza discipline or fire a troublesome driver working under a medallion owned by a medallion corporation owned by Mr. Fiorenza. This suggestion is not evidence that Mr. Fiorenza actually had the power to fire the driver. Ms. Lint’s opinion as to the authority of the medallion corporations over taxi drivers does not qualify as evidence that the medallion corporation actually had that authority. In addition, when asked by Mr. Sagar’s counsel at deposition, Ms. Lint expressly declined to testify that Ambassador, Mr. Fiorenza, or the medallion corporations actually had the authority to supervise taxi drivers. Moreover, Mr. Fiorenza has stated that if a taxi did not honor its contract with Ambassador to maintain its appearance, accept certain forms of payment, and so forth, he would “ask them to take the cab of[f] [Ambassador’s dispatch] service.” This, again, is not evidence of Ambassador’s authority to fire a taxi driver, While Ambassador may withdraw its dispatch services for violations of the contract under which they were provided, that decision to withdraw its dispatch services does not prevent the violating taxi driver from continuing to operate a taxi.

Mr. Sagar testified that he would be “told” the “time frame” in which he would work. However, the context of that testimony suggests it was the leaseholder, not the medallion corporation, who told him what shifts he would work. Also, the nature of Mr. Sagar’s work was a “shift driver” who would fill in for other drivers as needed. He testified that he got his shifts by “word of mouth” and asking other drivers for available work. By necessity, someone would need to tell him when such work was available. That does not mean that anyone assigned to Mr. Sagar specific shifts, much less that Ambassador, Mr. Fiorenza, or the medallion corporations did so.

If a driver does agree to pick up a passenger identified with the dispatch service, they may not later decline service to the passenger.

To the extent the parties draw analogies to Depianti, it is distinguishable from this case. In Depianti, a putative employer established a “regional master franchisee” to serve as an intermediary between itself and workers that provided services to customers. Id. at 609. The regional master franchisees collected payments from customers for the services of the plaintiff workers. Id. They remitted some of those fees to the defendant Jan-Pro as royalties, and the remainder to the workers. Id. The court concluded that a putative employer could not “insulate itself from liability for misclassification by causing or creating another entity to contract with its employees.” Id. at 622.
Here, Ambassador did not create the medallion corporations or leaseholders as intermediaries through which to do business with Mr. Sagar. The summary judgment record indicates that this structure for the taxi industry in Cambridge existed independently of Ambassador, and did not come about as an “end run around [section 148B].” Id. at 623-24.

Mr. Sagar emphasizes some incidental facets of Ambassador’s relationship with medallion owners and lessees that, on the surface, bear some resemblance to the type of work arrangement between himself and Ambassador necessary for section 148B to apply. For example, he points out that Ambassador does derive some revenue from its 10% processing fee applied to certain forms of payment redeemed by sub-lessee taxi drivers through Ambassador. By itself, this does not mean that Mr. Sagar rendered services as a taxi driver for Ambassador’s benefit. If it did, then Mr. Sagar could be said to work for any other entity that obtained revenue from his credit card transactions, like American Express, MasterCard, or Discover. This Court is obligated to construe section 148B to avoid such results. See Commonwealth v. Raposo, 453 Mass. 739, 745 (2009).

A significant difference exists between this case and a similar issue that arose in Sebago v. Boston, No. 12-00930 (Suffolk Super.Ct., Dec. 23, 2013). In Sebago, medallion owners and leaseholders argued that the plaintiff taxi drivers in that action performed no service on their behalf and that section 148B did not apply to analogous claims brought in that litigation. The Court in Sebago cogently reasoned that, because the defendant medallion owners and leaseholders in that action obtained “shift fees” from the plaintiffs’work, there was a dispute of material fact as to whether or not the plaintiffs performed services on behalf of the defendants under the type of “work arrangement” contemplated in Depianti, 465 Mass, at 624 n. 17, 625. Here, by contrast, the evidence is that the shift fees paid by Mr. Sagar and other drivers went to medallion owners and leaseholders, rather than dispatch service companies such as Ambassador.
There was no business relationship between the sub-lessees such as Mr. Sagar and Ambassador. Ambassador did not contract with customers to provide services that became Mr. Sagar’s responsibility to furnish. As a result, the insights provided by the Sebago decision do not apply to this case.

 ■'■It is likely true that, as Mr. Sagar suggests, without the services of himself and other taxi drivers, Ambassador’s dispatch service business would cease to operate. See Martins, 2013 WL 1320454, at *14, quoting Rainbow Dev., 2005 WL 3543770, at *3. However, that outcome would be an indirect consequence of the cessation of Mr. Sagar’s services, rather than a direct one. In Martins and Rainbow Dev., the putative employers’ businesses consisted of offering the services of their workers to their customers, such that, without their workers, their businesses would cease to operate as a direct result of no longer being able to offer any valuable service to their customers. Here, by contrast, Ambassador’s business is to offer dispatch services to medallion owners and leaseholders. The valuable service offered to those customers is Ambassador’s dispatch service. Granted, without taxi drivers, medallion owners and leaseholders would have little need for dispatch services, adversely affecting Ambassador’s business. But that result would follow from a decrease in demand for Ambassador’s dispatch services. In Martins and Rainbow Dev., the putative employers’ businesses would cease to operate without their workers because they would have no service to offer to their customers, irrespective of demand.
This distinction is important. According to the reasoning in Martins and Rainbow Dev., it is only where a putative employer would not have any services to offer to its customers without its workers, because it relies on its workers to provide those services, that it should be treated as their employer for the purposes of section 148B. Where the loss of a worker’s services might indirectly lead to the cessation of a business’s operation for other reasons, the conclusion does not automatically follow that such a worker is an employee of that business.